## THE GRIFFIN HOSPITAL *v.* COMMISSION ON HOSPITALS AND HEALTH CARE
### (12593)

HEALEY, SHEA, DANNEHY, CALLAHAN and JACOBSON, Js.

Argued March 13—decision released July 15, 1986

*A. Searle Pinney,* with whom were *Jeffrey B. Sienkie-wicz, Michael S. McKenna,* and, on the brief, *Alfred P. Forino,* for the appellant-appellee (plaintiff).

*Thomas J. Ring,* assistant attorney general, with whom were *Richard J. Lynch,* assistant attorney general, and, on the brief, *Joseph I. Lieberman,* attorney general, and *Maite Barainca,* assistant attorney general, for the appellee-appellant (defendant).

DANNEHY, J. On September 15, 1983, the defendant commission on hospitals and health care (commission), pursuant to its authority under General Statutes § 19a-156 (a), ordered the plaintiff, Griffin Hospital (hospital), to adopt a budget for the 1984 fiscal year. The budget ordered by the commission authorized revenues, operating expenses and capital expenditures in amounts substantially lower than those proposed by the hospital in a budget submitted to the commission on July 5, 1983. On September 29, 1983, the hospital appealed from the commission's September 15, 1983 budget order, and the matter was referred to *Hon. Thomas J. O'Sullivan,* state trial referee, who, exercising the powers of the Superior Court, rendered judgment on June 19, 1984. The referee, in a detailed memorandum of decision, upheld for the most part the budget reductions ordered by the commission, but modified the commission's order in several important respects. Neither party is satisfied with the judgment of the referee. The plaintiff has appealed from that judgment, and the defendant has cross appealed.

We begin with a brief outline of the facts. The hospital filed its proposed operating and capital expenditures budget with the commission on July 5, 1983. The hospital's budget proposed net patient revenues of $39,755,000, net operating expenses of $37,272,000, and capital expenditures of $1,483,668. On July 15, 1983, the commission notified the hospital that it had rejected the proposed budget, and that it would conduct a public hearing "to allow the hospital the opportunity to present evidence in support of the proposed

fiscal 1984 operating and capital budget." The notice also stated that the hospital should present its evidence at the public hearing "in a manner . . . consistent with the provisions of the commission's regulations." On August 8, 19 and 29, 1983, the commission conducted public hearings on the hospital's budget for the 1984 fiscal year. On September 15, 1983, it issued its decision and order requiring the hospital to adopt the budget as modified by the commission.

The budget ordered by the commission for the 1984 fiscal year authorized net patient revenues of $34,197,000, net operating expenses of $33,131,000, and capital expenditures of $411,800. The authorized figures represented reductions of $5,558,000, $4,141,000 and $1,071,868 respectively, in the amounts originally requested by the hospital in its proposed budget submitted on July 5, 1983. In its appeal to the Superior Court, the hospital challenged the reductions in its budget ordered by the commission on various statutory and constitutional grounds. The trial referee accepted some of the hospital's claims and rejected others. We now turn to the specific claims raised in the appeal before us.

I

GRIFFIN HOSPITAL APPEAL

A

PREEMPTION

The first of the hospital's contentions is that the commission's budget order conflicts with federal law and is therefore preempted under the supremacy clause. The hospital claims that the September 15, 1983 budget order required it to use federal medicare reimbursements to subsidize the health care costs of nonmedicare patients. Under the medicare program, the federal government reimburses participating hospitals for ser-

vices provided to medicare patients according to a set of preestablished rates, regardless of the actual cost to the hospital of the particular service provided. 42 U.S.C. § 1395ww (d). If the cost to the hospital of providing a particular service is less than the amount of reimbursement, the hospital, in effect, earns a "profit" from that service. Conversely, should the actual cost of a service exceed the preestablished rate of reimbursement, the hospital may be said to have incurred a "loss" on that particular service. According to the hospital's calculations, it would have earned under the budget ordered by the commission an aggregate "profit" of $1,754,000 solely from the care and treatment of medicare patients during the 1984 fiscal year. The commission's budget, however, provided for a gain of only $99,000 from total operations—the combined gain arising from the care and treatment of both medicare and nonmedicare patients. Thus, according to the hospital, under the commission's budget, it was forced to incur an operating loss of $1,655,000 from the care and treatment of nonmedicare patients, which loss was to be subsidized by its operating gain of $1,754,000 from its "medicare business," resulting in a net operating gain of $99,000. The hospital claims that the commission's action in this case conflicts with the federal medicare reimbursement system "because the ordered budget deprives the Hospital of the choice to use its Medicare [profits] in the manner which it deems most appropriate."

Preemption analysis has two prongs. In order to conclude that state regulatory action has been preempted, it must be determined that (1) Congress has evidenced an intent to occupy the field or (2) the state regulation actually conflicts with federal law. *Silkwood* v. *Kerr-McGee Corporation,* 464 U.S. 238, 248, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984); *Times Mirror Co.* v. *Division of Public Utility Control,* 192 Conn. 506, 510–11, 473

A.2d 768 (1984). The hospital does not claim that an actual conflict exists between the commission's budget order and the federal medicare reimbursement system. Rather, it contends that "Congress intended to preempt the state from regulating the field of Medicare cost containment and reimbursement." We do not agree. We fail to see how the federal method of medicare reimbursement can be said to preempt the state from regulating overall costs at individual medical facilities. The commission's budget order does not purport to restrict the number of medicare patients actually treated by the hospital, or the federal level of reimbursement for any of the services provided. The "profits" anticipated by the hospital from its medicare operations under the commission's budget are attributable, in part, to the level of overall operating expenses *set by the commission.* If the hospital were allowed to operate at the expense level originally proposed in its July 5, 1983 budget, then its medicare "profits" would quickly disappear. Since any adjustment by the commission of overall expenses would necessarily affect the level of medicare "profits," we believe that it has the authority to regulate such "profits" to the extent that they exist.

The preeminent purpose of the medicare reimbursement system is to control the cost to the federal government of the medicare program. Prior to October 1, 1983, the federal government reimbursed participating hospitals based on the reasonable costs actually incurred by the hospital in providing health care services to medicare patients. 42 U.S.C. §§ 1395e, 1395f (b), 1395ww (b). Congress recognized that a reimbursement system based on actual costs provided hospitals with little or no incentive to increase efficiency in the provision of medical services. See H. R. Rep. No. 25, 98th Cong., 1st Sess., 132, reprinted in 1983 U.S. Code Cong. & Ad. News 219, 351. The medicare "prospective

payment" system, effective October 1, 1983; Pub. L. No. 98-21, § 601 et seq., 97 Stat. 149 (1983); establishes reimbursement rates for medical services regardless of the actual cost to the hospital. 42 U.S.C. § 1395ww (d). As a necessary corollary of the prospective payment system, hospitals are encouraged to contain costs associated with the treatment of medicare patients, and thereby to turn a "profit," in a manner of speaking, on medicare operations. We simply cannot accept, however, the hospital's contention that the purpose of Congress in enacting the prospective medicare reimbursement system was to allow participating hospitals to earn "profits" from their treatment of medicare patients, and then to insulate these "profits" from all state regulation. This is not a case where Congress has explicitly provided that the recipient of federal funds " 'may' use the monies for 'any' . . . purpose." *Lawrence County* v. *Lead-Deadwood School District*, 469 U.S. 256, 259, 105 S. Ct. 695, 83 L. Ed. 2d 635 (1985). Rather, Congress has simply established uniform reimbursement rates for specified medicare services. The commission's primary purpose and concern is to control the rapidly increasing cost of health care. We believe that the work of the commission is fully compatible with the intent of Congress to control the cost of the federal medicare program. We therefore reject the hospital's claim that the commission's September 15, 1983 budget order unconstitutionally conflicts with the federal medicare reimbursement system.

## B

### SCOPE OF REVIEW

We next address the hospital's claims of error relating to specific items cut from its proposed budget by the commission in its September 15, 1983 decision. Before turning to those claims, we reiterate for the benefit of all concerned that the scope of our review

is extremely limited. Judicial review of the commission's budget decision is governed by the Uniform Administrative Procedure Act. General Statutes § 4-166 et seq. With regard to questions of fact, it is neither the function of the trial court nor of this court "to retry the case or to substitute its judgment for that of the administrative agency." *Madow* v. *Muzio,* 176 Conn. 374, 376, 407 A.2d 997 (1978); *Hospital of St. Raphael* v. *Commission on Hospitals & Health Care,* 182 Conn. 314, 318, 438 A.2d 103 (1980); see General Statutes § 4-183 (g). "Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 5, 434 A.2d 293 (1980); *Cervantes* v. *Administrator,* 177 Conn. 132, 134, 411 A.2d 921 (1979)." *Burnham* v. *Administrator,* 184 Conn. 317, 322, 439 A.2d 1008 (1981). The present appeal is from the decision of the trial court. We review that decision only to determine whether it was rendered in accordance with the Uniform Administrative Procedure Act. General Statutes § 4-183 (g).

Much of this appeal concerns the hospital's claims that it was denied due process by the alleged failure of the commission to observe its governing statutes and regulations. In this regard a final point deserves special emphasis. Although the interpretation of statutes is ultimately a question of law; *Connecticut Hospital Assn., Inc.* v. *Commission on Hospitals & Health Care,* 200 Conn. 133, 140, 509 A.2d 1050 (1986); it is the well established practice of this court to "accord great deference to the construction given [a] statute by the agency charged with its enforcement." *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 326, 307 A.2d 155 (1972) (*Loiselle, J.,* concurring), cert. denied, 409 U.S. 1116,

93 S. Ct. 903, 34 L. Ed. 2d 699 (1973); accord, *Fellin* v. *Administrator,* 196 Conn. 440, 447, 493 A.2d 174 (1985); *Board of Education* v. *Connecticut State Board of Labor Relations,* 190 Conn. 235, 241, 460 A.2d 1255 (1983); *Chamber of Commerce of Greater Waterbury, Inc.* v. *Lanese,* 184 Conn. 326, 331, 439 A.2d 1043 (1981); *Connecticut State Board of Labor Relations* v. *Board of Education,* 177 Conn. 68, 74, 411 A.2d 28 (1979); *Connecticut Light & Power Co.* v. *Public Utilities Control Authority,* 176 Conn. 191, 198, 405 A.2d 638 (1978); *Anderson* v. *Ludgin,* 175 Conn. 545, 555, 400 A.2d 712 (1978). This principle applies with even greater force to an agency's interpretation of its own duly adopted regulations. The commission's September 15, 1983 budget decision consumes ninety-five pages of the record on this appeal. The commission's decision reflects an in-depth analysis of the hospital's programs, facilities and personnel requirements as measured against standardized cost and utilization profiles contained in the commission's regulations. The legislature has expressly directed the commission to adopt such regulations; General Statutes § 19a-160; and the validly enacted regulations of an administrative agency carry the force of statutory law. *Salmon Brook Convalescent Home* v. *Commission on Hospitals & Health Care,* 177 Conn. 356, 363, 417 A.2d 358 (1979); *Roy* v. *Centennial Ins. Co.,* 171 Conn. 463, 473, 370 A.2d 1011 (1976). The commission is specially constituted by the legislature to coordinate, throughout the state, the efficient utilization of hospital resources in an effort to contain the burgeoning cost of health care. The courts cannot hope to duplicate the work of the commission, or to make hospital budget determinations with the same level of expertise as that possessed by the commission staff. We therefore approach the issues raised in this appeal both with an awareness of the limitations inherent in the review process itself,

and with due deference to the broad grant of regulatory authority which has been delegated to the commission by our legislature. See General Statutes §§ 19a-150, 19a-151, 19a-153 (a), 19a-154 (a), 19a-156 (a).

## C

### NONVOLUME EXPENSE REDUCTIONS

The single largest reduction in the hospital's budget ordered by the commission occurred in the area of non-volume expense increases, i.e., proposed new programs, new services, and additional staffing. In its July 5, 1983 budget submission, the hospital had proposed to increase its nonvolume expenses for the 1984 fiscal year by $4,244,000. On July 15, 1983, the commission issued its preliminary decision ruling that the $4,244,000 proposed increase in nonvolume expenses was presumptively unreasonable and would be disallowed. The commission further notified the hospital that it would conduct a public hearing during which the hospital would be afforded an opportunity to justify its budget "in a manner consistent with the provisions of the Commission's regulations."

On appeal, the hospital claims that the commission's September 15, 1983 decision disallowing the proposed increase in nonvolume expenses was made upon improper procedure which denied the hospital due process, and that the decision was not supported by reliable, probative and substantial evidence. The commission advanced several reasons in support of its September 15, 1983 decision to disallow the proposed increase in nonvolume expenses. We must uphold the commission's decision if any of those reasons are sufficient to justify the action taken. See General Statutes § 4-183 (g) (5); *Lawrence* v. *Kozlowski,* 171 Conn. 705, 713–14, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977). One reason given by the commission was the failure of the

hospital to justify, on an individual basis, each budget item of its proposed increase in nonvolume expenses. Because we find that reason sufficient to sustain the commission's action in this case, we need not address the hospital's related claims of error challenging the additional reasons given by the commission.

The hospital does not claim to have justified individually the need for its proposed new programs, facilities and additional staffing. Rather, the hospital claims that, under the commission's regulations, it was not required to do so. Since the commission's July 15, 1983 notice of hearing directed the hospital only to justify its proposed budget increases "in a manner consistent with . . . the Commission's regulations," the hospital claims that the commission did not give it "proper notice of its concern for evidence dealing with the 'merits' of the non-volume expense increases." The hospital also contends that "this lack of notice prevented it from preparing and presenting meaningful testimony on such matters."

The hospital's claim that it was not required to justify individually its proposed nonvolume expense increases is based on its peculiar construction of § 19a-160-111 (c) of the commission's regulations.[1] Section 19a-160-111 describes the methodology used by the commission to evaluate a hospital's proposed increases in nonvolume expenses. The commission applies certain mathematical formulae to the proposed area of expansion, and computes a "presumptively reasonable" level of expense. Regs., Conn. State Agencies § 19a-160-111 (b). The expense of a proposed item is evaluated in terms of a standard "cost center screen." Id. When a hospital's proposed nonvolume expense increase fails to sat-

---

[1] Regs., Conn. State Agencies § 19a-160-111 (c) (formerly § 19-730-11 [c]). The commission has redesignated the provisions of its regulations since it issued its September 15, 1983 budget decision. Throughout this opinion we refer to the regulations by their present designations.

isfy the test of presumptive reasonableness as determined against the cost center screen, § 19a-160-111 (c) requires the hospital "to justify all its non-volume requests in the cost center. A Hospital shall be required to justify why increases up to the amount by which it failed the cost center screen cannot be financed through improvements in internal efficiencies."

The hospital contends that under § 19a-160-111 (c) it was required only to "justify why increases up to the amount by which it failed the cost center screen [could] not be financed through improvements in internal efficiencies." The hospital's proffered construction plainly ignores the first sentence of § 19a-160-111 (c), which required it "to justify *all* its non-volume requests in the cost center." (Emphasis added.) As noted, the hospital in this case failed the test of presumptive reasonableness as to its entire $4,244,000 proposal, and therefore, it was required under § 19a-160-111 (c) to justify "all its non-volume requests" at the budget hearing.

We find nothing contradictory or abstruse in the language of § 19a-160-111 (c). That section merely requires a hospital whose budget proposal has failed the test of presumptive reasonableness first to justify *all* requests in the particular cost center, and then, to the extent that it has done so, to further justify why the proposals cannot be financed through improvements in internal efficiencies. We therefore reject the hospital's claim that it was not given adequate notice that it would be required at the hearing to justify specifically its proposed increases in nonvolume expenses. The commission's July 15, 1983 notice of hearing clearly informed the hospital that it would be required to justify its budget in a manner consistent with the commission's regulations. The hospital is expected to know what those regulations provide. Section 19a-160-111 (c) clearly required the hospital to justify individually *all*

of its nonvolume requests in the cost center. The hospital's failure to do so provided the commission an adequate reason to disallow the proposed increases in nonvolume expenses. The trial court properly sustained the commission's decision in this respect.

## D

### 1982 COMPLIANCE ADJUSTMENT

On May 31, 1983, the commission decided to impose a $261,000 compliance adjustment[2] against the hospital during its 1984 fiscal year based upon its 1982 fiscal year operations. The hospital received notice of the commission's decision on June 1, 1983. The notice also instructed the hospital to request a hearing if it wished to contest the commission's decision. By letter dated June 16, 1983, the hospital requested a hearing on the commission's 1982 compliance adjustment, and suggested that, in the interest of efficiency, the hearing be held as part of the upcoming 1984 budget review process. The commission agreed and responded to the hospital by letter dated June 30, 1983, that "we will plan on conducting said hearing as part of the 1984 fiscal budget process as you suggest." The hearings on the hospital's 1984 proposed budget took place in August, 1983, with neither party bringing up the matter of the commission's May 31, 1983 compliance decision. Thereafter, the commission, in its September 15, 1983 final decision on the hospital's proposed 1984 fiscal year budget, enforced its earlier compliance decision,

[2] A compliance adjustment is imposed by the commission when a hospital exceeds in a given year its authorized level of revenues. The excess revenues are carried forward as a source of funds in a future budget. Regs., Conn. State Agencies § 19a-160-116. In this case the commission determined that the hospital had exceeded its authorized revenues for fiscal year 1982 by $261,000. The commission therefore included that amount as a source of revenue for the 1984 fiscal year. The effect of the commission's decision, of course, was to reduce the *actual* revenues collectible by the hospital in fiscal year 1984 by $261,000.

and included the full $261,000 as a source of funds for the 1984 fiscal year.

The hospital claims that it was denied due process because the commission never scheduled a *special* hearing on its May 31, 1983 compliance decision during the August, 1983 budget hearings for the 1984 fiscal year. We find this claim to be without merit. Due process requires that a party adversely affected by government action be afforded an *opportunity* to be heard. *Murphy* v. *Berlin Board of Education,* 167 Conn. 368, 374, 355 A.2d 265 (1974); *Hart Twin Volvo Corporation* v. *Commissioner of Motor Vehicles,* 165 Conn. 42, 44–46, 327 A.2d 588 (1973). The hospital in this case was afforded such an opportunity. That it elected not to take advantage of it is not the fault of the commission. The commission is responsible for regulating the budgets of all hospitals in this state. It makes its budget decisions according to standard formulas and procedures set forth in its regulations. The commission's budget determinations, to the extent made in accordance with its duly enacted regulations, are presumptively legal. Any challenge to those determinations must be initiated by the aggrieved hospital. The hospital in this case was fully aware of how the commission had arrived at a figure of $261,000 as a compliance adjustment for fiscal year 1982. If that figure was incorrect, or if the imposition of a compliance adjustment for fiscal year 1982 was otherwise improper, then the burden was on the hospital to expose the error or identify the impropriety.

Pursuant to the understanding reached between the commission and the hospital, the hospital was afforded the opportunity to challenge the 1982 compliance adjustment during the August, 1983 budget hearings. The hospital itself suggested that its challenge to the 1982 compliance adjustment be considered in conjunction with the main hearings on its proposed 1984 budget. Since the hospital had the burden of identify-

ing the alleged errors in the commission's May 31, 1983 decision, the commission could reasonably have expected the hospital to initiate the discussion. The trial court properly sustained the action of the commission in imposing the $261,000 compliance adjustment for the 1982 fiscal year.

E

1983 COMPLIANCE ADJUSTMENT

In addition to imposing a compliance adjustment for fiscal year 1982, the commission also imposed a compliance adjustment of $509,000 for fiscal year 1983 in its September 15, 1983 budget decision. The hospital claims that the 1983 compliance adjustment was not authorized by the commission's regulations, or in the alternative, that the adjustment, if authorized, was imposed without adequate notice. We find that the 1983 compliance adjustment was properly imposed.

We first address the hospital's claim that a compliance adjustment for fiscal year 1983 was not authorized by the commission's regulations. Section 19a-160-116 (a) (1) prescribes the circumstances under which a current year compliance adjustment may be imposed. That section provides, in pertinent part, that where a "hospital's current year net revenues are in excess of the authorized budget, the net revenue amount in excess of such authorized budget, after recognition of volume and inflation variations, is to be considered as a source of funds in the ensuing fiscal year . . . ." It is undisputed that the hospital's actual net revenues for fiscal year 1983, *unadjusted for inflation,* were not in excess of the amount authorized by the commission. The commission determined, however, that these revenues, when adjusted for inflation, exceeded the authorized budget for fiscal year 1983 by $509,000, and hence, ordered that that amount be included as a source of funds in the hospital's 1984 fiscal year budget.

The hospital's argument is based on its particular construction of § 19a-160-116 (a) (1). The hospital contends that under § 19a-160-116 (a) (1) its current year revenues, unadjusted for inflation, must exceed authorized revenues before the excess may be considered a source of funds in the ensuing year. We disagree with the hospital's interpretation. The plain language of § 19a-160-116 (a) (1) requires the commission to calculate the effect of inflation in determining the amount of actual revenue received by a hospital in a given fiscal year. Moreover, § 19a-160-107 sets out the procedure to be followed by the commission in determining the effect of inflation on a hospital's budget. An initial "inflation factor" is predicted. Regs., Conn. State Agencies § 19a-160-107 (b). The predicted inflation factor is then adjusted twice during the fiscal year based upon the actual rate of inflation. Regs., Conn. State Agencies § 19a-160-107 (f). Finally, the hospital's actual revenues and expenses are recomputed at the end of the fiscal year in accordance with a revised inflation factor. We believe that the commission correctly interpreted § 19a-160-116 (a) (1) to require an adjustment for inflation in the hospital's fiscal year 1983 net revenues. Accordingly, a compliance adjustment was authorized by the commission's regulations.

We next address the hospital's claim that it did not receive notice that a compliance adjustment for fiscal year 1983 would be enforced against it. The hospital concedes that it, and not the commission, computed the 1983 compliance adjustment of $509,000. The hospital argues, however, that it computed this figure according to a formula contained on forms supplied by the commission that the hospital was required to complete as part of the 1984 budget process. The hospital never agreed that the 1983 compliance adjustment was fair or accurate, and in effect, filed the relevant forms under protest. Nonetheless, the hospital included the

$509,000 as a source of funds in its July 5, 1983 budget submission as it was required to do. In order to balance its budget, however, the hospital offset the $509,000 source of funds against a corresponding $509,000 application of funds. In its July 15, 1983 preliminary decision, the commission did not modify either the entry of the $509,000 source of funds, or the corresponding entry of the $509,000 application of funds as allocated in the hospital's budget. The commission, however, eliminated the $509,000 application of funds from the hospital's budget in its September 15, 1983 decision, and entered a corresponding reduction in the hospital's budget base.[3]

In its July 15, 1983 preliminary decision, the commission included a staff workpaper, form Y (b), which along with the $509,000 compliance adjustment, reflected the hospital's proposed $509,000 application of those funds. As to both the compliance adjustment and the application of funds entries, the workpaper noted that the "Hospital will detail explanation as to the $509,000 at the time of the public hearing." Thereafter, on August 1, 1983, the commission filed a revised form Y (b) in which certain entries differed from those on the original version. The revisions on the latter form Y (b) concerned entries entirely unrelated to the $509,000 compliance adjustment and proposed application of funds. The revised form Y (b), however, did not repeat the handwritten notation contained on the earlier form concerning the hospital's need to explain what it intended to do with $509,000 application of funds. The hospital contends that the revised form Y (b) entirely superceded the original, and thus, that the com-

---

[3] Although the trial court found no error in the commission's imposition of the 1983 compliance adjustment, it held that the corresponding reduction ordered by the commission in the hospital's budget base was improper. The commission has cross appealed from the latter ruling. We consider the commission's claim of error at part II, A, infra.

mission's failure to include the notation on the revised form "indicated its unqualified approval of the $509,000 application of funds. . . ." We reject the hospital's claims for the two following reasons.

The hospital had no legitimate reason to believe that the revised form Y (b) filed by the commission had any effect on the handwritten notation contained on the original form. Form Y (b) is a worksheet matrix containing budget items across its top and down the lefthand side. Various columns of subordinate figures are added to reach aggregate sums in each column. Any changes in any of the subordinate figures in any column would require changes in the aggregates. The revised form Y (b) was obviously filed to call attention to changes made in unrelated subordinate figures, and to the resulting changes in the aggregate sums. That unrelated entries included on form Y (b) required modification was no reason for the hospital to conclude that unmodified entries had, by implication, been unqualifiedly approved. We do not believe that the revised form Y (b) can be read to accomplish anything other than what it purported, which was to enter certain changes in subordinate figures in columns entirely unrelated to the 1983 compliance adjustment.

More important, however, is our second reason, namely, that even if the revised form Y (b) were held to completely supersede the original form, and thereby to cast into oblivion the handwritten notation on the original form, the hospital's claim to a lack of notice about the 1983 compliance adjustment would still be without merit. In this regard it is necessary to refine the hospital's claim. The hospital does not contend that it was completely unaware of the 1983 compliance adjustment. The hospital itself had computed the adjustment and filed the required forms under protest. The hospital's complaint is more precisely directed at the manner in which the compliance adjustment was

ultimately enforced. The commission might have enforced the compliance adjustment in either of two ways. It might simply have allowed the $509,000 in revenue, which the compliance adjustment represented, to supplement the hospital's proposed revenue authorization for the 1984 fiscal year. Under this approach, the compliance adjustment would merely constitute $509,000 in additional revenue—at least on paper—and $509,000 in additional authorized expense, allocated somewhere in the budget, to be used or not as the hospital desired during the 1984 fiscal year. This is what the hospital believed the commission had decided when it filed its revised form Y (b) in which, according to the hospital, the commission "indicated its unqualified approval of the $509,000 application of funds. . . ." Thus, the hospital, due to its misreading of the commission's July 15, 1983 preliminary decision, can state in its brief that "the commission *in effect* [had] imposed no compliance adjustment." (Emphasis added.)

The commission, however, did not enforce the 1983 compliance adjustment as outlined above. Instead, it acted in accordance with its published regulations and enforced the 1983 compliance adjustment in a manner less agreeable to the hospital. In its September 15, 1983 final decision, the commission reduced the hospital's revenue authorization for the 1984 fiscal year by $509,000, the amount of the 1983 compliance adjustment. This action, of course, necessitated a corresponding reduction in the hospital's authorized budget base during the 1984 fiscal year. Section 19a-160-116 sets forth the procedure to be followed by a hospital in order to avoid a loss in authorized revenue due to the imposition of a current year compliance adjustment. Section 19a-160-116 (a) (1) provides that any excess in current year net revenues over the authorized budget "is to be considered as a source of funds in the ensuing fiscal year, thus reducing net patient revenues in

the ensuing fiscal year unless an alternate use of the funds is approved by the commission as a part of the budget process. *Requests for such alternate use must be made to the commission in writing as part of the budget submission.*" (Emphasis added.) In its July 15, 1983 notice of hearing, the commission expressly informed the hospital that it would be required to justify its budget "in a manner consistent with . . . the commission's regulations." In view of the plain language of § 19a-160-116 (a) (1), we do not see how the hospital could legitimately have concluded that the revenue represented by the 1983 compliance adjustment had been preserved merely by the hospital's submission, on form Y (b), of an unexplicated figure of $509,000 as an application of funds. The commission, under its regulations, was not required to approve or disapprove of the proposed $509,000 application of funds in its preliminary budget decision, and accordingly, the hospital should not have drawn significance from the failure of the commission to renew its handwritten notation on the revised form Y (b). The hospital's reliance on the commission's supposed approval of the $509,000 application of funds was particularly unjustified in light of the express caveat contained in the commission's July 15, 1983 notice of hearing. That caveat stated: "[I]t should be noted that pursuant to Section 19-73o-4 (d) of the Commission's regulations the determination by the Commission in this preliminary decision that a proposed financial requirement, or a portion thereof, is presumptively reasonable, will neither be binding on the Commission in any further review of the hospital's budget nor excuse the hospital from the requirement that it justify said financial requirements as necessary in any such further review."[4]

---

[4] Regs., Conn. State Agencies § 19a-160-103 (d) (formerly § 19-73o-4 [d]). The caveat contained in the commission's July 15, 1983 notice of hearing is a verbatim recital of the language used in the regulation cited.

We think that the hospital was adequately notified that it would be required to justify an alternate use of the funds represented by the 1983 compliance adjustment or have those funds deducted from its revenue authorization for the 1984 fiscal year. The commission informed the hospital that it would be required to justify its budget in a manner consistent with its regulations, and the hospital must be charged with knowledge of what those regulations say. The commission was not required to remind the hospital on form Y (b) that it would be expected to justify its proposed application of the 1983 compliance adjustment. That burden was already placed squarely on the hospital by § 19a-160-116 (a) (1) of the commission's regulations. The hospital therefore had no reason to believe that the proposed application of funds had been "unqualifiedly approved" when the commission failed to repeat the notation on the revised form Y (b). If the hospital needed more information concerning what items had been approved or disapproved in the commission's July 15, 1983 preliminary decision, it could have asked the commission for "a more definite and detailed statement" as provided in the Uniform Administrative Procedure Act. General Statutes § 4-177 (b) (4). We find no merit in the hospital's claim to a lack of notice that the 1983 compliance adjustment might be enforced.[5]

## F

### PHILANTHROPIC FUNDS

In fiscal year 1983, the hospital exceeded its authorized budget for capital expenditures by $81,000.

[5] We also note that General Statutes § 4-183 (e) allows the court on request of a party to order that "additional evidence be taken before the agency upon conditions imposed by the court." This section also allows an agency to modify its previous findings and decision after its reconsideration of additional evidence. Thus, the hospital could have invoked General Statutes § 4-183 (e) to present the evidence necessary to justify its proposed budget even after the commission had rendered its final decision on September 15,

Accordingly, the commission imposed a compliance adjustment in that amount in the hospital's 1984 capital budget. The hospital claims that the $81,000 represented philanthropic funds, and that such funds are expressly exempted from commission regulation by General Statutes § 19a-153 (c). General Statutes § 19a-153 (c) provides, in pertinent part, that "the commission . . . shall not direct or control the use of the . . . principal and all income from restricted and unrestricted grants, gifts, contributions, bequests and endowments." We think the language of this subsection is plain and unambiguous: the commission may not regulate the use of philanthropic funds.

The commission argues that since money is fungible, it is impossible to know whether funds spent on a particular item are actually philanthropic in origin. While we tend to agree with the commission's observation, we believe that its argument proves too much. If the hospital were required to segregate its philanthropic bequests and include the total as a source of funds in a budget submission, the commission would clearly be directing and controlling the use of those funds in the hospital's authorized budget. On the other hand, if the hospital were to spend the philanthropic funds as they were received, it would exceed its authorized level of expense in the fiscal year. The commission's argument, if accepted, would prevent the hospital from spending philanthropic funds at all unless regulated by the commission. Such regulation, of course, would directly contravene General Statutes § 19a-153 (c).

The commission also notes that the expenditure of funds for capital acquisitions often entails incidental expenses, e.g., a machine requires electricity, maintenance, and someone to operate it. There is nothing in

1983. The failure of the hospital to utilize this procedure precludes it from now claiming that it had no notice of, or opportunity to contest, the budget cuts made by the commission.

the language of General Statutes § 19a-153 (c) to prevent the commission from identifying and regulating incidental expenses which may be associated with the expenditure of philanthropic funds. The philanthropic expenditure itself, however, may not be regulated.

If General Statutes § 19a-153 (c) is to be given any effect, the hospital must be allowed to designate how it has spent its philanthropic funds. We need not resolve on this appeal the myriad problems which may arise relating to verification of funds received, and the application of those funds. We do note in passing that the commission may adopt regulations relating to the issue of verification. For purposes of this appeal, we hold that the commission may not impose a compliance adjustment based on a hospital's expenditure of adequately verified philanthropic funds. The commission does not contend that the funds expended in this case were not philanthropic and thus, verification is not an issue on this appeal. We therefore conclude that the commission improperly imposed the $81,000 compliance adjustment based upon the hospital's exceeding its authorized capital budget for the 1983 fiscal year.

II

CROSS APPEAL BY THE COMMISSION

A

REDUCTION IN BUDGET BASE

The commission has appealed from various aspects of the trial court's decision in this case. We first address its claim that the trial court erred in concluding that the commission improperly cut $497,000 from the hospital's budget. The $497,000 cut under consideration represents the $509,000 fiscal year 1983 compliance adjustment which we have previously determined was properly imposed, offset however, by $12,000 in projected losses in anticipated expense recoveries as

determined by the commission. The trial court held that the $497,000 cut was improper because it found that the hospital had "no notice . . . that the cut might be made." We disagree.

The $497,000 reduction in the hospital's proposed budget was derived from the $509,000 compliance adjustment for the 1983 fiscal year. Although the trial court found that the hospital had adequate notice of the 1983 compliance adjustment, it held, somewhat incongruously, that the hospital did not have adequate notice that enforcement of the compliance adjustment would result in a corresponding reduction in the hospital's budget base. As our previous discussion would suggest, we think the hospital should have been aware that its net patient revenues in the 1984 fiscal year would be reduced "unless an alternate use of the funds [was] approved by the commission as a part of the budget process." Regs., Conn. State Agencies § 19a-160-116 (a) (1). The commission in its September 15, 1983 decision specifically noted the failure of the hospital to "provide any testimony with respect to the $497,000 base adjustment." The hospital claims, consistently with its argument relating to the 1983 compliance adjustment, that it offered no testimony on the $497,000 budget modification because it had no prior notice that the compliance adjustment might be imposed. The hospital, however, *should* have known, and therefore, should have presented evidence at the hearing relating to an alternate use of the funds represented by the 1983 compliance adjustment. The trial court erred in its determination that the hospital did not have adequate notice of the $497,000 modification to its budget base.

## B

### REPAIR AND MAINTENANCE EXPENSE

As has previously been discussed in our consideration of the hospital's appeal, the trial court in large part

sustained the action of the commission in the area of nonvolume expense reductions. In three instances, however, the trial court found that the commission's nonvolume expense reductions were improper. The first of these was a $593,000 proposed expenditure for repair and maintenance. In its September 15, 1983 decision, the commission cut the $593,000 from the budget because the hospital "did not give a dollar breakdown for the items [it] identified as necessary and therefore the commission was not able to evaluate and authorize dollars for each item individually." The trial court held that the commission's action was improper because it had not given the hospital "notice that an individual cost breakdown was required." We disagree.

As with the other nonvolume expense proposals eliminated by the commission and approved by the trial court, the burden was on the hospital to justify why the expenses were necessary. Section 19a-160-111 (c) clearly provides that "[s]hould a hospital not pass the cost center screen, it will be required to justify *all* its non-volume requests in the cost center." (Emphasis added.) The hospital in this case did not pass the cost center screen with respect to its nonvolume requests. The hospital provided no details to the commission as to the dollar amount associated with individual projects within the cost center. It was therefore impossible for the commission to determine whether any given proposal was justified in terms of its cost. As has been previously discussed, the hospital has chosen to disregard the first sentence of § 19a-160-111 (c) quoted above. We believe that that sentence provided the hospital with adequate notice that it would be required to provide the commission with the cost of individual proposals within the cost center. We conclude that the trial court erred in its determination that the commission had not given the hospital adequate notice that such individual cost breakdowns would be required.

## C

### SALARY ADJUSTMENT

As part of its nonvolume expense, the hospital budgeted $1,000,000 to provide a one-time salary adjustment for its nonphysician employees. In its September 15, 1983 decision, the commission authorized $150,000 of the request, but cut the remaining $850,000 from the hospital's budget. The primary reason relied upon by the commission to justify its cut of the $850,000 was that the hospital, after repeated requests, had failed to produce evidence in justification of its full $1,000,000 salary adjustment. The evidence sought by the commission was a ten volume report prepared by a private consultant for the hospital containing data concerning 119 nonexecutive positions and 37 managerial positions within the hospital. The conclusions contained in this report formed the basis of the hospital's $1,000,000 salary request.

The trial court held that the commission had improperly denied the hospital's salary request. The trial court found that "[t]he record indicates that the study was in the hearing room . . . the [hospital's] attorney stated that the study contained sensitive information which should not be put in evidence because it would then be a public document anyone might read. He suggested that it could be made available for the staff and, after review, those parts of it necessary for findings of fact and decision making could be made part of the public record." The trial court concluded that the hospital had in fact made the study available to the commission, and that the commission's finding to the contrary was unsupported by the record.

The trial court's findings and conclusions on this matter are supported by the record. The study prepared for the hospital contained personal information which

was not necessary to the commission's decision on the hospital's salary request. The hospital's suggestion that the commission review the study in its entirety and introduce into evidence only those portions necessary to support its decision was not unreasonable. The commission's refusal to consider the study as submitted by the hospital was an abuse of its discretion. General Statutes § 4-183 (g) (6). Therefore, the asserted failure of the hospital to produce the report cannot sustain the commission's decision to deny the $1,000,000 salary request. As that was the primary reason offered by the commission in support of its decision, the decision cannot stand. The trial court did not err in its determination that the commission had improperly cut $850,000 from the hospital's salary request.

### D

### LONG RANGE PLANNING

The hospital budgeted $210,000 in nonvolume expense for long range planning. Of this amount, $50,000 was budgeted for legal costs in connection with a review of the hospital's corporate structure, the medical staff bylaws, and the physician compensation plan; $75,000 for architectural services in connection with the preparation of a plan of development and general renovation; $35,000 for computer research on the demographic and market characteristics of the hospital's service area; $10,000 for computer costs associated with the research; and other such expenses. In its September 15, 1983 decision, the commission cut $160,000 from the hospital's request on the ground that the hospital had adequate "in-house expertise, the expense of which is already in the hospital's budget, to develop the majority of the plan." The trial court held that the commission's finding of adequate expertise within the hospital to develop the long range plan was unsupported by the evidence.

We cannot say that the trial court's finding that the commission improperly cut the $160,000 from the hospital's planning budget was clearly erroneous. The commission has not pointed to any evidence in the record to support its finding that the hospital possessed adequate in-house expertise to develop the proposed plan. Rather, the commission claims that the trial court erred because the burden was on the hospital to show that its management personnel did not possess the requisite expertise. In this instance we must disagree with the commission. The hospital could not reasonably have been expected to prove the negative, i.e., that its management personnel were inadequate to perform the proposed functions. The record established that the hospital administration consisted of seven individuals, none of whom appeared, either by training or job function, qualified to perform the legal, architectural or computer services proposed by the hospital. We conclude that the trial court did not err in its determination that the commission had improperly cut $160,000 from the hospital's budgeted expenses for long range planning.

### E

#### CAPITAL CARRYOVER

In its July 5, 1983 budget submission, the hospital requested authorization for capital expenditures in the amount of $1,484,000 for the 1984 fiscal year. The commission in its July 15, 1983 preliminary decision determined that $412,000 of the hospital's capital request was presumptively reasonable, and disallowed the remainder. In its proposed capital budget, the hospital had included $689,000 which the commission had approved for capital expenditures in fiscal years 1981 and 1982, but which the hospital had not expended in those years due to a lack of available funds. In its September 15, 1983 final decision, the commission ruled

that the hospital had not justified its proposed capital expenditures budget beyond the presumptively reasonable amount of $412,000, and expressly disallowed the proposed capital carryover. The hospital contends that the commission has no authority to regulate the use of unexpended capital authorizations from past fiscal years, and thus claims that the commission improperly disallowed the $689,000 in unexpended authorized funds from fiscal years 1981 and 1982. We disagree.

The hospital's claim that the commission improperly disallowed the $689,000 capital carryover is based on the particular wording of the commission's September 15, 1983 final decision. In that decision the commission had stated: "The commission's *posture* on the carryover of capital requires the hospital to make a request to carry over capital and address each item individually. The carry over of $689,000 from prior years was not addressed specifically in testimony and was not considered as [an] item to be approved by the commission." (Emphasis added.) The hospital contended in the trial court, and contends on appeal, that the commission's so-called "posture" on carryovers is, in effect, a regulation which has not been promulgated in accordance with the Uniform Administrative Procedure Act. General Statutes §§ 4-166 (7), 4-167 (b), 4-168; see *Salmon Brook Convalescent Home* v. *Commission on Hospitals & Health Care,* 177 Conn. 356, 362, 417 A.2d 358 (1979). The trial court accepted the hospital's contention, for it could not "find any such authority in the regulations for such 'posture' and therefore [held] that the defendant commission's ruling [was] illegal." While the commission's choice of words may have been regrettable, we do not think that its "posture" on carryovers can sensibly be viewed as anything other than a necessary application of its published regulations. See *Eagle Hill Corporation* v. *Commission on Hospitals & Health Care,* 2 Conn. App. 68, 76, 477 A.2d 660 (1984).

The commission's authority for its so-called "posture" derives from the regulatory procedure by which it reviews a hospital's proposed capital budget. The commission initially applies an "overall test of reasonableness" to the net patient revenues as proposed by a hospital in its budget submission. Regs., Conn. State Agencies § 19a-160-103 (a). A hospital's budget which does not meet the overall test of reasonableness is subject to a series of specified analyses; Regs., Conn. State Agencies § 19a-160-103 (c); including an analysis of "capital expenditures." Regs., Conn. State Agencies § 19a-160-103 (e) (3). The regulations provide that "[c]apital budgets will be reviewed for the hospitals as described in section 19a-160-115." Regs., Conn. State Agencies § 19a-160-104 (b). Section 19a-160-115 (a) allows the commission to "determine the relationship of applications of funds such as authorized capital expenditures . . . to sources of funds such as depreciation, transfers from board designated funds, and commitment to long term debt." Where the commission determines that "funding requirements exceed the sources identified, the commission may modify the hospital's request." Thereafter, "any hospital objecting to the modification will be required to justify the proposed use of current patient revenue" for capital improvements. Id.

Section 19a-160-115 (a) clearly grants the commission the authority to regulate, i.e., to approve or disapprove, a hospital's proposed sources and uses of capital funds. Applying its regulations, the commission initially determined that the hospital's proposed net revenues did not meet the overall test of reasonableness. Therefore, the hospital's budget was subjected to the analyses specified in § 19a-160-103. The hospital's proposed capital budget was not found to be "presumptively reasonable" as provided in § 19a-160-103 (b), and the commission "modified" the hospital's request. Regs., Conn. State

Agencies § 19a-160-103 (a). The hospital was informed of this modification in the commission's July 15, 1983 preliminary decision. It therefore became the hospital's burden, under § 19a-160-115 (a) of the commission's regulations, to justify its proposed sources of capital funds. There is nothing in the commission's regulations to suggest that capital funds consisting of unexpended authorizations from past budgets should be treated differently from capital funds arising from any other source. The regulations merely require a hospital to justify its proposed sources and uses of capital funds. The commission's September 15, 1983 decision clearly states that the hospital, during the August budget hearings, did not "specifically address" the need for the requested capital items. Its failure to do so provided the commission an adequate reason to disallow the portion of the hospital's proposed capital budget not found to be presumptively reasonable under the commission's regulations. Regs., Conn. State Agencies § 19a-160-115 (b).

The hospital effectively claims that unexpended capital authorizations from years past should provide a "safe harbor" of accumulated future authorization, insulated from regulation by the commission much the same as philanthropic funds. It is the hospital's position for which there is no authority, and not the commission's "posture." Philanthropic funds are beyond the power of the commission to regulate because the legislature has clearly and expressly said so. General Statutes § 19a-153 (c). The legislature, however, has not made similar provision for unexpended past capital authorizations. On the contrary, the legislature has delegated to the commission a near plenary power to regulate the budgets of hospitals in this state. The hospital's dissatisfaction with that delegation is presently addressed to the wrong branch of government.

## F

### CONDITIONS IMPOSED BY THE COMMISSION

The commission also claims error in the trial court's conclusion that two conditions imposed on the hospital by the commission in its final decision were unreasonable. The commission's September 15, 1983 budget decision contained nine terms and conditions, in numbered paragraphs, with which the hospital was ordered to comply. Paragraph 7 ordered the hospital to file with its 1985 budget a long range financial plan encompassing fiscal years 1985, 1986 and 1987. Paragraph 8 ordered the hospital board of trustees to file bi-monthly reports detailing the hospital's compliance with the September 15, 1983 budget order. The trial court held that these conditions were unreasonable because the hospital and its board of trustees would be unable to comply with their terms.

Although the commission has the right to impose reasonable conditions as a necessary incident of its regulatory authority; *Eagle Hill Corporation* v. *Commission on Hospitals & Health Care,* supra, 80; it does not have the authority to impose conditions with which a hospital is unable to comply. The trial court's determination that the hospital would be unable to comply with the conditions imposed in paragraphs 7 and 8 is intrinsically factual. The commission has presented us with no reasons why or how the trial court's determination was erroneous. The burden is on the appellant, in this case, the cross appellant, to present an adequate record for review on appeal. Practice Book § 3060D. The trial court did not err in disallowing the conditions imposed in paragraphs 7 and 8 of the commission's September 15, 1983 budget decision.

## G

We finally address the commission's related claims that the trial court erred in granting a stay of the commission's budget decision, and in later modifying that stay. On September 15, 1983, the commission rendered its final decision on the hospital's budget for the 1984 fiscal year. The hospital filed its appeal from that decision on September 29, 1983, and at the same time filed an application for a stay. After a hearing, the trial court, *Curran, J.*, on November 2, 1983, granted the stay of the commission's budget decision. Under the terms of the stay, the hospital was permitted to collect patient revenue in accordance with its proposed budget. The hospital was also permitted to incur expenses in excess of those authorized by the commission. With regard to capital expenditures, however, the trial court expressly limited the hospital to the amount authorized by the commission.

The trial court, *O'Sullivan, J.*, rendered its decision on the merits of the hospital's appeal on June 19, 1984. On July 9, 1984, the hospital filed its appeal from the trial court's decision. Thereafter, the hospital filed in the trial court a motion to modify the stay order which had been entered by Judge Curran on November 2, 1983. It appears that the hospital had gone ahead with capital improvements during the 1984 fiscal year which had not been authorized by the commission. The capital expenditures undertaken by the hospital were also made in direct violation of the November 2, 1983 stay order, in which Judge Curran had ordered that capital expenditures be limited to the amount ordered by the commission. The hospital in its motion to modify the stay sought an increase in its authorized capital budget, essentially to comport with the unauthorized capital

expenditures it had already made. The trial court, *O'Sullivan, J.,* on September 25, 1984, granted the motion "reluctantly only because doing so may in some small way help to solve the controversy between the parties." The trial court also noted that its ruling was "not to be interpreted as the [c]ourt's [having] approved the expenditures made."

The issues raised under the present claim are essentially the same as those which we have previously considered, at great length, in an earlier phase of the unending controversy which appears to exist between these parties. In *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 196 Conn. 451, 455, 493 A.2d 229 (1985), we stated that General Statutes § 4-183 (c), providing for "a stay upon appropriate terms," gives the trial court "broad authority to fashion appropriate relief to protect the interest of all those involved during the pendency of an administrative appeal." We also noted that in "granting a stay upon 'appropriate terms' [the trial court] could modify [the budget] or effectuate its own budgetary plan as a modus vivendi." Id. With regard to the November 2, 1983 order, the trial court did not err in staying the commission decision which might have been "found after judicial review to have been unwarranted." Id., 463. With regard to the November 25, 1984 modification order, we note that the funds for which modification of the stay order was sought had already been spent. The trial court was not required to enter a futile order which it had no power to enforce. While we agree with the trial court that the hospital's violation of Judge Curran's order is not to be condoned, we believe that the commission is the proper body to enforce compliance with its September 15, 1983 budget decision as modified on appeal. The trial court did not err in its November 25, 1984 order granting the hospital's motion to modify the November 2, 1983 stay.

There is error in part and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.