[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Plaintiff is an employee organization (Union) which represents the certified administrators employed by the Derby Board of Education; pursuant to the Teacher Negotiation Act (TNA General Statutes § 10-153e et seq.).
The Connecticut State Board of Labor Relations (CSBLR) is authorized pursuant to the TNA to resolve complaints concerning violations of such acts by Unions or boards of education.
Plaintiff union filed a complaint on December 6, 1993 with the Labor Board alleging that the board of education violated the TNA by refusing to bargain concerning the elimination of the position of Director of Instruction and the reassignment of the duties for such position.
The labor board heard the complaint during ten days of hearings between January 19, 1995 and September 12, 1995. The parties submitted post hearing briefs and the hearing was closed on February 22, 1996. The CSBLR decided the case by decision #3450, issued November 6, 1996.
The Plaintiff filed this timely appeal of such decision on December 13, 1996. The appeal is filed pursuant to the Uniform Administrative Procedures Act § 4-166 et seq. and § 10-153E(G)(4). The answer and record were filed on February 14, 1997; Plaintiff's Brief on April 24, 1997. The CSBLR Brief was filed on June 9, 1997 and the Board of Education's Brief on June 6, 1997. The parties were heard at oral argument on September 26, 1997.
Essentially, the facts of this case are not in dispute. The decision's findings of facts include the following:
FINDINGS OF FACT
 1. The School Board is an employer within the meaning of the Act. CT Page 10051
 2. The Union is an employee organization within the meaning of the Act and was, at all times material to the complaint, the exclusive bargaining representative for all certified administrators employed by the Board.
 3. The School Board and the Union were parties to successor collective bargaining agreements with effective dates of July 1, 1987 through June 30, 1993 and July 1, 1993 through June 30, 1996.
 4. On January 12, 1989, the Connecticut State Department of Education issued a report in response to a complaint filed against the School Board pursuant to Conn. Gen. Stat. Section 10-4b. That report dealt with certain deficiencies in the Derby schools, including the need for a full-time coordinator of curriculum.
 5. On or around July 1, 1989, Dr. Nathan Chesler assumed the position of Superintendent of Schools for the School Board.
 6. In response to the findings and recommendations of the Connecticut State Department of Education, Chesler recommended that the School Board fill a position for a full-time coordinator of curriculum. The Board adopted this recommendation and authorized the hiring for the position of Director of Instruction.
 7. Chesler drafted and posted the notice of Administrative Vacancy and job description for the Director of Instruction.
 8. Lois Caprio was hired as Director of Instruction and assumed that position on or around October 16, 1989.
 9. The position of Director of Instruction was included in the bargaining unit.
 10. While Caprio occupied the position of Director of Instruction, she had five major areas of responsibility, as set forth in the job CT Page 10052 description, which took the following approximate percentages of her time:
 Approximate % Area of Responsibility of Time Spent
 Supervise Student-Teacher Training Program 5% Coordinate Curriculum Development 
Revise/Modify Curriculum When Necessary 25% Coordinate Staff Development with Superintendent 30% Complete Grant Proposals 15-30% Supervise and Coordinate System-Wide Testing Program 10%
 11. As the Supervisor of the Student Teacher Program, Caprio matched Student Teachers and Cooperating Teachers in the district and oversaw the students' placements.
 12. In her work on the curriculum, Caprio evaluated the subject matter and the current curriculum, and supervised and coordinated the evaluation and revisions of curriculum made by "curriculum committees" which modified the curriculum. The committees included staff within and outside of the bargaining unit. She also coordinated the implementation of curriculum across school levels. The Superintendent also performed some of the curriculum coordination.
 13. By the time Caprio left the position in June, 1993, nearly all the revisions to curriculum necessary to respond to the Section 10-4b report had been made. The remaining areas left to be done in curriculum coordination and development were the ongoing coordination and supervision of curriculum and the periodic review of curriculum.
 14. In the area of staff development, Caprio worked with a staff development committee consisting of employees from within and outside the bargaining unit, including Chesler, in developing a staff development plan and plans for CT Page 10053 staff training programs. She contacted outside contractors to present material, and planned and scheduled staff development programs.
 15. Chesler, who had a background in the area of staff development, trained Caprio in that area. He also had ongoing responsibility in the area of staff development. He contacted, interviewed and selected presenters, scheduled sessions, prepared materials, and coordinated the programs with Caprio. Chesler also determined whether continuing education credits should be approved for the programs.
 16. Caprio had exclusive responsibility for completing certain grant proposals such as "Chapter 2" grant proposals and certain one-time grants.
 17. Prior to and during Caprio's tenure as Director of Instruction, other grant proposals were prepared by other members of the bargaining unit, as well as individuals outside the bargaining unit including Chesler, one teacher and an outside contractor, including the large "Chapter 1" grant proposals. Caprio had little or no involvement in these other grant proposals.
 18. On June 17, 1993, the School Board voted to eliminate the position of Director of Instruction effective July 1, 1993, solely for economic reasons.
 19. The position of Director of Instruction was eliminated July 1, 1993 and has not been reinstated.
 20. After the position of Director of Instruction was eliminated, some of the duties that Caprio had performed were performed by other bargaining unit members and persons outside the bargaining unit. Specifically, the overall responsibility for staff development was fulfilled by the Superintendent and outside contractors. The duties of completing grant proposals and monitoring grants were CT Page 10054 fulfilled by the Superintendent, outside consultants, other members of the bargaining unit and teachers. The duties for curriculum supervision and coordination were fulfilled by the Superintendent and school principals; the latter of which are members of the bargaining unit. The duties for the student teacher program and the districtwide testing were assumed by members of the bargaining unit.
Based on these factual findings the labor board applied its "shared-work" doctrine, holding it was not a violation of the TNA to reassign "shared-work" to non-bargaining unit members.[1]
The issue raised by this appeal is whether the decision violates the TNA, because it considers the Superintendent of Schools as having "shared-work" with the Director of Instruction.
The Plaintiff argues that the Superintendent of Schools is not subject to the TNA; is not a public employee and as a matter of public policy should not be considered in a "shared-work" analysis.
The Superintendent of Schools is clearly excluded from the purview of the TNA, § 10-153b(b). However, so are assistant superintendents, confidential employees, temporary substitutes and noncertified employees of boards of education § 10-153b(b). Plaintiff cites no authority for the proposition that persons not covered by the act should not be used in a "shared-work" analysis. To the contrary, authority exists that the "shared-work" analysis has been applied universally to all persons whether or not they had collective bargaining rights. See, Middletown RedevelopmentAuthority, Dec. No. 1880 (1980) ("shared-work" between bargaining union and non-union employee); Waterbury Board ofEducation, Dec. No. 1436 (1976) ("shared-work" between employees of different bargaining units); Town of EastHaven, Dec. No. 2020 (1981) ("shared-work" analysis between summer temporary employees and bargaining unit members);Naugatuck Board of Education, Dec. No. 2534 (1987) (analysis of work done by non-employee volunteers and bargaining unit members); and Town of Willington, Dec. No. 2238 (1983) (included in "shared-work" analysis part-time elected First CT Page 10055 Selectman).
Thus, for over twenty years the CSBLR has broadly defined and applied the "shared-work" doctrine in a manner consistent with consideration of an exempt employee. This type of construction of the TNA is precisely the type of labor issue entitled to deference by the courts, Board ofEducation v. Connecticut State Board of Labor Relations,190 Conn. 235, 241 (1983). The CSBLR is specifically charged with enforcement of the TNA, and thus is entitled to "great deference." State Board of Labor Relations v. Board ofEducation, 177 Conn. 68, 74 (1979).
In the instant case, Plaintiff does not appeal the decision's consideration of subcontractors having shared the Director of Instruction work. What substantive difference is there between one kind of non-employee (sub-contractor) and another (Superintendent of Schools)? The Town ofWillington decision, supra, specifically included an elected official in the "shared-work" analysis. Thus, it makes no difference whether the superintendent is an elected official or not.[2]
The Plaintiff argues that the superintendent is the chief executive officer of the school system (§ 10-157a) and supervises all employees. Plaintiff speculates about administrative bargaining unit erosion by a superintendent in performance of his/her supervisory responsibilities. The facts here demonstrate that the superintendent did more than supervise from a distance, see finding of fact #15. The work shared by the superintendent was specific and substantial.
The Plaintiff's public policy claim is equally speculative. The legislature has provided for a single Superintendent. The potential for erosion of the administrator's unit by a superintendent who will assume all the administrative duties is non-existent. Presumably the single superintendent is performing duties as chief executive of the district, which would prevent the assumption of the specific responsibilities of other administrators.
Plaintiff includes criticism of the decision's factual basis in its brief. CT Page 10056
"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Citations and internal quotation marks.) Dolgner v.Alander, 237 Conn. 272, 280 (1996).
"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action." (Citations and internal quotation marks omitted; footnote omitted.) Dolgner v.Alander, 237 Conn. 272, 281 (1996). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations and internal quotation marks omitted.) Id.
This court "must decide, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion. Ottochian v. Freedom of Information Commission,221 Conn. 393, 397, 604 A.2d 351 (1952). Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . New Haven v. Freedom of InformationCommission, 205 Conn. 767, 774, 535 A.2d 1297 (1988)." CT Page 10057 (Internal quotation marks omitted.) Perkins v. Freedom ofInformation Commission, 228 Conn. 158, 164-65 (1993).
"Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Griffin Hospital v. Commission onHospitals Health Care, 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S.Ct. 781,93 L.Ed.2d 819 (1986); see also New Haven v. Freedom of InformationCommission, supra, 773-74; Wilson v. Freedom of InformationCommission, 181 Conn. 324, 342-43, 435 A.2d 353 (1980)." (Internal quotation marks omitted.) Perkins v. Freedom ofInformation Commission, 228 Conn. 158, 165 (1993).
The extensive record includes substantial evidence supporting the finding of fact. The conclusions follow logically from such findings.
The appeal is dismissed.
McWEENY, J.