[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiffs, James DiLieto and Santella DiLieto, appeal the decision of the defendant Guilford Planning Zoning Commission ("PZC") approving the application of defendants Angelo Moscato and Earl Tucker, Jr. ("applicants"), to divide their land into three lots.
Plaintiffs own property known as 288 Briarwood Drive, Guilford, which abuts land which is the subject of the application CT Page 3287 for subdivision. As abutters, plaintiffs are aggrieved persons within the meaning of 8-8 (a) of the General Statutes. Point O'Woods Assn., Inc., v. Zoning Board of Appeals, 178 Conn. 364,366; Smith v. Planning Zoning Board, 203 Conn. 317, 321.
On November 5, 1990, the PZC filed a Motion for Permission to Introduce Additional Evidence. In response to said motion, this court, on November 27, 1990, remanded this case to the PZC "to allow the Commission to receive evidence relating to the issue of whether the development proposal which is the subject of this appeal is a subdivision or resubdivision [of] land and to allow the Commission to consider the record as so expanded."
In accordance with said remand, the PZC, on December 5, 1990, received additional evidence. Based on all the evidence presented to it, the PZC voted "That the [PZC] finds that the Partridge Hill Section II application [i.e., the application in issue] is a subdivision."
On January 22, 1991, the PZC filed with this court a Supplemental Return of Record, which together with its Return of Record of July 16, 1990, constitutes the entire record considered by the PZC.
The appeal should be dismissed.
By application dated March 3, 1990, the applicants requested approval of a three-lot subdivision plan entitled "Record Map 
Site Development Plan-Partridge Hill Section II." The applicants also applied to the Guilford Inland Wetlands Commission [the "IWC"] for a wetlands permit. The applicants are listed on both applications as the owners of the subject property, which is located on Briarwood Lane and shown as Lot 13 on Assessor's Map #89.
The PZC considered the applicants' proposal at its regular meeting, March 7, 1990; no public hearing was held. The only action taken by the PZC on March 7, 1990 was to vote "to receive this item."
At its regular meeting, held April 11, 1990, the IWC voted to approve, with conditions, the applicant's request to conduct regulated activities.
The PZC considered the applicants' proposal at its regular meeting on May 2, 1990 and voted to grant two waivers and to approve the application subject to four conditions. Notice of the PZC's decision was duly published in the Shore Line Times on May 9, 1990. CT Page 3288
This court heard arguments on February 15, 1991, at which time the defendants' responses to plaintiffs' requests to admit were introduced as Plaintiffs' Exhibits A and B.
Plaintiffs argue that the applicants' proposal constitutes a "resubdivision" not a "subdivision" and, therefore, that the PZC was required to hold a public hearing on the proposal.
Section 8-18 of the General Statutes defines "subdivision" and "resubdivision" as follows:
 "`[S]ubdivision' means the division of a tract or parcel of land into three or more parts or lots made subsequent to the adoption of subdivision regulations by the commission, for the purpose, whether immediate or future, of sale or building development expressly excluding development for municipal, conservation or agricultural purposes, and include resubdivision; `resubdivision' means a change in a map of an approved or recorded subdivision or resubdivision if such change (a) affects any street layout shown on such map, (b) affects any area reserved thereon for public use or (c) diminishes the size of any lot shown thereon and creates an additional building lot, if any of the lots shown thereon have been conveyed after the approval or recording of such map;. . ."
The same definitions appear in 1.2.6 of the Guilford Subdivision Regulations.
Section 8-26 of the General Statutes provides:
 ". . .The commission shall have the authority to determine whether the existing division of any land constitutes a subdivision or resubdivision under the provisions of this chapter, provided nothing in this section shall be deemed to authorize the commission to approve any such subdivision or resubdivision which conflicts with applicable zoning regulations.
 . . .The commission may hold a public hearing regarding any subdivision proposal if, in its judgment, the specific circumstances require such action. No plan of resubdivision shall be acted upon by the commission without a public CT Page 3289 hearing."
Section 8-18 is derived from 105i of the 1947 Supplement to the General Statutes, which defined "subdivision" as follows:
 "`[S]ubdivision' shall mean the division of a tract or parcel of land into three or more lots for the purpose, whether immediate or future, or sale or building development expressly excluding development for agricultural purposes, and shall include resubdivision."
No definition of "resubdivision" was given. However, the following definition of "resubdivision" was added to the General Statutes in 1953 by Public Act 504:
 "`[R]esubdivision' shall mean a change in a map of an approved or recorded subdivision or resubdivision if such change (a) affects any street layout shown on such map, or (b) affects any area reserved thereon for public use, or (c) diminishes the size of any lot shown thereon, if any of the lots shown thereon have been conveyed after the approval or recording of such map."
These two definitions appeared unchanged, except for the removal of the commas following the word "map" in subsection (a) and "use" in subsection (b) of the definition of "resubdivision," in the 1955 Supplement to the General Statutes. Conn. Gen. Stat. 384d (1955 Supp.).
Section 8-26 is derived from 111i of the 1947 Supplement to the General Statutes and contains the exact same language making public hearings optional for "subdivision" proposals and mandatory for "resubdivision" proposals that first appeared in 111i. The public hearing requirement for "resubdivisions" appears to have existed before the legislature defined that term.
The legislative histories of 105i and 111i shed little light on the legislative intent behind the original definition of "subdivision," which has undergone relatively few changes, or the difference in the hearing requirements for "subdivisions" and "resubdivisions."
In 1959, the legislature amended the definition of "subdivision" by adding the words "parts of" before the word "lots". Conn. Pub. Acts No. 679, 1 (1959). Commenting on the bill which contained the proposed amendment, the Representative from Guilford explained: "This is intended to make clear that the subdivision of land does not mean only the cutting up of land into CT Page 3290 pieces for sale alone." 8 H.R., Pt. 11, 1959 Sess., p. 4509.
In 1967, Public Act 21 inserted the words "and creates an additional building lot" in subsection (c) of the definition of "resubdivision." Conn. Pub. Acts No. 221 (1967). Representative Lucille Matarese of the 3rd District states:
 "Now, included within the definition of subdivision is he word, `re-sub-division', and under re-sub-division, where you — where once you have a sub-division of property, and if any one of the lots, and this could be in a development of a hundred or a hundred and fifty lots, if any one of the lots thereafter is diminished to change the lot line, this means that if an owner of lots one and two had a diagonal line or a boundary line that wasn't quite straight, and they merely wanted to straighten it out they — it would be, under our law, a re-sub-division. It would be considered a re-sub-division and they in turn would have to before — go before the Town Planning Commission for permission to do this. And they would also be required to file a new plot plan with the town clerk's office.
 I don't think it ever was the legislative intent of the act to include any small change in the boundary of a lot, within the terms of `subdivision,' and for this reason, I have proposed an amendment which would mean, in effect, that if any lot is diminished in size, whereby you create a new lot, then it would be considered a re-sub-division and they would have to go before the Town Planning Commission for approval on it. We run into problems where people have tried to straighten out boundary lines in various towns, and where under this statute they have been required to go through the whole procedure as they would for a sub-division. I think this would clarify the law. My impression is that as long as there is not a — as long as there would be no violation of any existing zoning ordinance, or regulation by changing the lot size, that it would be unnecessary to require them to go before the Town Planning Commission.
Thank you.
Yes, Tom. CT Page 3291
Rep. Byrne:
 Are you familiar with the bill that Representative (Inaudible) introduced?
Rep. Matarese:
 I haven't read the bill. I know she's introduced a bill. I've seen a bill that I think Senator Buckley has introduced. And on that one I would raise questions, because his bill would make it diminishing the size of any three lots or more. This — particularly if you're title searching in a development, it would cause a tremendous burden, not only upon the title searcher, but upon the landowners, to find out when you come to the point of being over three lots. So that the fourth man in line would be required to go before the Town Planning Commission.
 I don't think that you're in a situation where you are affecting a sub-division as such. If `A' buys lots one and two and `B' buys lots three, if `A' wants to sell off ten feet of one of his lots, and there's no zoning violation incurred, and it's not a new building lot, I don't think you're affecting a sub-division in such a way that the Town Planning would want to get involved to approve of it, or disapprove of it, and go through the process of requiring a new map."
Conn. Joint Standing Committee Hearings, General Law, Pt. 6, 1967 Sess. pp. 1714-15.
I House passed this bill amended by Schedule A. 12 H.R. Proc., Pt. 5, 1967 Sess., p. 2131. The effect of Schedule A was to substitute the words "an additional building" for "a new." Id. at 2128. Without Schedule A, the bill would have proposed the insertion of "and creates a new lot" in subsection (c) of the definition of "resubdivision." Representative Matarese stated:
 "Mr. Speaker, this amendment [Schedule A] is merely for the purpose of clarifying the language in the proposed bill. The language now refers to the creation of a new lot, it is vague, and the change is to make it read an additional building lot which was the original intent. It is a technical amendment and I move its passage." CT Page 3292
Id. at 2128-29. Representative Nicholas Lenge from the 13th District also supported Schedule A on grounds that "[i]t clarifies what would otherwise be ambiguous language." Id. at 2129.
Representative Matarese made the following comments on the bill as amended by Schedule A:
 Mr. Speaker, this bills [sic] amends Sec. 8-18
insofar as the definition of resubdivision is concerned. This statute defines what constitutes a subdivision and resubdivision of land. So as to require approval by a town plan commission. Anything that is within thescope [sic] of meaning of a definition subdivision or resubdivision must be submitted upon application for approval to the planning commission. Under the present law once you have an approved subdivision on file in the town clerk's office after any one of the lots thereon have been conveyed any change which would diminish the size of any lot would automatically constitute a resubdivision and would require an application for approval to be filed. In effect, this means that once a subdivision of lots has been approved and some or all of the lots have been sold, if at this point the individual owners of two adjoining lots want to straighten out a boundary line or wanted to sell the other owner 2 ft. or 5 ft. of his lot, under the present law this would be a resubdivision. Since it would result in the diminishing size of the lot even though there be no zonign [sic] violation resulting therefrom and the parties would be required to file an application with the town planning commission and go through the whole procedure exactly as though it were a new subdivision in the first instance. This can result in an expenditure of considerable money insofar as the parties themselves are concerned and can further result in an expenditure of considerable exact time and an additional burden so far as the town plan commission is concerned. So long as no zoning violation results it would seem to be a needless exercise to require the parties in these instances to appear for approval again. Under the proposed bill a resubdivision would exist in these instances only where the change diminishes the size of the lot and thereby creats an additional building CT Page 3293 lot. This would allow adjoining zoners to straighten out boundary lines if desired. It would not excuse zoning violation in these instances they would still have to apply for a special exception or a variance to the zoning board of appeals."
Id. at 2129-31.
The Senate passed the bill as amended by Schedule A upon motion by Senator Fauliso, who stated that the bill "provides that the diminishing of a lot merely to adjust boundaries without the creation of a new lot shall not be construed to be a resubdivision." 12 S. Proct., Pt. 3, 1967 Sess., pp. 1226-27.
Language inserted by this bill, which became Public Act 221 (1967), defines, under 8-18 (c), a resubdivision to mean a change in a map of a subdivision which not only diminishes the size of a lot shown thereon, but also creates an additional building lot if any lot thereon has been conveyed after approval or recording of such map. See, Burns, "Powers and Procedures of the Planning Commission." 52 Conn. B.J. 396, 397 (October 1978). It appears that the legislature intended to exempt adjustments to lot lines even after the recording of the original subdivision map, as long as such change in lot lines does not create an additional lot. Conn. Joint Standing Committee Hearings, General Law, Pt. 6, 1967 Sess., p. 1716.
In 1973, the legislature amended 8-26 to require the submission of illegal subdivisions and resubdivisions to the planning commission for approval, thus, overruling Dooley v. Town Planning and Zoning Commission, 151 Conn. 151 (1963). Conn. Gen. Stat. 8-26 (rev'd to 1989, as amended); Conn. Pub. Acts No. 73-550 (1973). In Dooley, the court held that a planning commission only had the power to act with regard to proposed subdivisions and that if a subdivision was made without authority and thus illegal, an application seeking approval of the already accomplished subdivision is not within the planning commission's jurisdiction. Dooley, 151 Conn. at 153-54.
In reaching its holding, the court in Dooley also relied on the holding of Peninsula Corporation v. Planning Zoning Commission, 149 Conn. 627, 630 (1962). ["Peninsula I"] to the effect that the planning commission has no authority to decide whether particular property constitutes a subdivision. See Dooley, 151 Conn. at 153. Peninsula I was an action for a declaratory judgment to determine whether certain premises constituted a "subdivision." The plaintiff owned a large tract of land and had sold over twenty pieces from that tract to others. The commission refused to issue building permits to the owners of CT Page 3294 the smaller pieces on grounds that the plaintiff had not filed a subdivision map. Peninsula I, 149 Conn. at 627-28.
The trial court had determined that the issue of what constitutes a subdivision must be decided by the planning commission in the first instance. The Supreme Court reversed stating that it found "no such requirement" in the statutes:
 "[T]he commission does not decide whether any particular property is a subdivision; its function is to approve, or modify and approve, or disapprove, the plan of a claimed subdivision. . . ."
Id. at 630. The court ordered a new trial to determine whether the premises constitute a "subdivision." See Peninsula Corporation v. Planning Zoning Commission, 151 Conn. 450 (1964) ["Peninsula II"].
Subsequent to Peninsula I and Peninsula II, the legislature passed Public Act 73-550 which provides that planning commissions "shall have the authority to determine whether the existing division of any land constitutes a subdivision or resubdivision. . . ." Conn. Pub. Acts No. 73-550 (1973); Conn. Gen. Stat. 8-26 (rev'd to 1989), as amended).
In 1977, the legislature amended 8-18 by inserting in the definition of "subdivision" the words "made subsequent to the adoption of subdivision regulations by the commission" following "or more parts or lots." Conn. Pub. Acts No. 77-545, 1 (1977); Conn. Gen. Stat. 8-18 (rev'd to 1989).
Since the 1977 amendment, "subdivisions" include only those divisions of land made subsequent to the adoption of regulations. See Conn. Gen. Stat. 8-18, 8-25 (rev'd to 1989).
"Subdivisions" are only those divisions of land made subsequent to the adoption of regulations; Conn. Gen. Stat. 8-18
(rev'd to 1989); and "subdivisions" must be approved before they are recorded ; Conn. Gen. Stat. 8-25 (rev'd to 1989); there can be no recorded but unapproved "subdivisions." A conceivable exception would be divisions of land made subsequent to the adoption of regulations (i.e. "subdivisions") which required approval before recording but nevertheless were recorded without approval. However, these "subdivisions" would be void. Conn. Gen. Stat. 8-25 (rev'd to 1989).
In the instant case, plaintiffs claim that the subject property was part of a prior "subdivision" and, therefore, that the applicants' proposal constituted a "resubdivision," concerning CT Page 3295 which a public hearing was required to be held. On remand to the PZC, plaintiffs introduced testimony of Lawrence W. Fisher ("Fisher"), a licensed land surveyor in Connecticut doing business as LWF Land Surveying in Branford, and supporting documents. Fisher testified that "the parcels that came to be a piece of land as of June 26, 1953," the date on which the Guilford Subdivision Regulations were adopted, "were actually acquired by Frank Melesk [a.k.a. Frank Moleski]. . .as two separate properties. . ." in 1902 and 1909. Said land of Frank Melesk is described in a map prepared by Fisher, i.e. "Compiled Plan Tracing the Property Divisions of Land of Frank Moleski." These two "L" shaped parcels, which were contiguous in 1957, passed to Alexandria Moleske (Moleski). The southern "L" shaped parcel had been split in 1909 by the sale of a 60 foot wide strip of land on which the Shore Line Electric Railway was built.
In 1957, Alexandria Moleske conveyed all of the shaded property north of the "first division" line on said Fisher map to Mary Moleske Paulovski. The land south of the first division line was conveyed by Alexandria Moleske to John Moleske by deed in 1959. Mary Moleske Paulovski conveyed the strip north of the "second division" line to Joseph and Margaret Paulovski in 1958, thereby creating a third parcel from the contiguous land owned by Frank Melesk (Moleski) as of June 26, 1953.
The remaining land of Mary Moleske Paulovski, that which was south of the "second division" line, was conveyed to the C. L. Kenney Son, Inc. and Empire Paving, Inc. in 1986. Said property was conveyed to the applicants by deed dated September 11, 1987, and on the same date, the "Record Map-Subdivision Partridge Hill" was filed in the land records.
The Paulovski's strip of land, north of the "second division" line, was divided into two parcels in 1988. While Fisher calls the Paulovski division a "subdivision", the recorded map showing that division does not clearly indicate whether subdivision approval or site plan approval or both were granted.
Fisher characterized the Partridge Hill II proposal, which is the subject of the application now in issue, as "the fifth action to divide the property that was originally the Estate of Frank Melesk on June 26, 1953" and the divisions proposed as "in fact the eleventh, twelfth, thirteenth and fourteenth including [a] small piece that was also called Partridge Hill that has been cut away from the original tract."
Fisher also testified that the Partridge Hill Subdivision approved in 1987 ["Partridge Hill I"] "contained eight parcels, seven of which were identified as lots and one which was labeled Parcel A." CT Page 3296
Counsel for plaintiffs argued that "the designation of Parcel A, instead of a numerical designation, does not keep the entire parcel, the gross parcel, from being resubdivided. . . ." He stated:
 "[The proposal] is a change in a map of an approved or recorded subdivision or resubdivision and here it diminishes the size of any lot shown thereon and creates an additional building lot. So even if this were not the fifth resubdivision, if this were simply the first time that after the Partridge Hill subdivision created a subdivision including Parcel A and because you are now through Section 2 of Partridge Hill, further dividing up and diminishing the size of that same Parcel A, you are creating a resubdivision for which all the intended safeguards of the Statute and your Regulations, should have pertained, but unfortunately, did not."
However, counsel for the applicants, pointed out, the Partridge Hill I subdivision map shows "seven clearly marked lots." The remaining land is designated as "Parcel A, Other Land of C. L. Kenney and Son and Empire Paving," which counsel stated was not intended to be a lot, i.e. lot 8, of the subdivision, he continued:
 "If you would believe [plaintiffs' counsel's] argument, it would mean that every time somebody had Section One or Section Two you couldn't go back and come in here again without having a Public Hearing. . .[I]n order for it to fit within your definition it would have to be a change in a map of an approved or recorded subdivision which affects any street layout shown on such map, affects an area or diminishes the size of any lot shown thereon. This is not a lot shown thereon."
Morris Woodworth ("Woodworth"), a land surveyor with Russell Waldo Associates, preparers of the Partridge Hill maps, stated that he did not believe Partridge Hill II is a resubdivision and that the Partridge Hill I application was "for seven lots and that's what was approved." He stated that if Partridge Hill II was a resubdivision, there are many illegal subdivisions in town.
Defendants argue that, as of the date the Partridge Hill II proposal was submitted, lots from the Partridge Hill I subdivision had been sold and conveyed to third persons. CT Page 3297
Town Counsel points out that the Partridge Hill I subdivision map contains "two bits of information that are not necessarily compatible":
 "One is that the total area is 29.4 acres. I added those up and that includes the seven lots plus this nine acres that is called Parcel A. So when he says he has 29.4 acres it includes Parcel A as well. Then it has total lots, seven. So then in the subdivision they are saying they are asking for seven lots and not including Parcel A as a lot."
The Partridge Hill I subdivision map reflects the accuracy of Town Counsel's statement.
Town Counsel also offered the following observations:
 "[T]he requirement of our Subdivision Regulations, Section 3.2, is that a site development plan shall show existing conditions and improvements and all contiguous land of the applicant that may be subdivided in the future. So this Commission could find that Parcel A is in response of the requirement of Section 3.2 that contiguous land be shown. The purpose of the plan is to allow the Commission to complete its general planning review of the proposed subdivision including its relationship with the future subdivision of contiguous land of the applicant. And then, as both Attorney's have said, I just simply have to go back to the definition of a subdivision, a resubdivision rather. I believe the only map that we have, and we have a resubdivision that is changing the map of an approved or recorded subdivision, so that's this map which diminishes the size of any lots shown thereon and creates an additional building lot. If you find that Parcel A Other Land, which is a lot, then we have a resubdivision. If you find that its Other Land to be shown under 3.2, we don't have a resubdivision, that's a decision I'd like you to make. . . ."
Commissioner Lee Titus then stated:
 "I think we've had a consistent pattern of interpreting Parcel's A of that type as not being a lot, so we'd have to make a reversal of CT Page 3298 our historic position. In order to say that Parcel A is a lot and therefore this is a resubdivision."
Section 3.2 of the Subdivision Regulations provides:
 "Site Development Plan: The Site Development Plan shall be drawn to a scale of not less than 1" = 100'. The plan shall show existing conditions and the proposed layout of lots, streets and improvements for the proposed subdivision and all contiguous land of the applicant that may be subdivided in the future. The purpose of the plan is to allow the Commission to complete a general planning review of the proposed subdivision including its relationship to the future subdivision of contiguous land of the applicant. Four (4) blue line or blank line prints shall be submitted. The plan shall show at least the information specified in Par. 3.4 as applicable to the particular subdivision."
Section 3.3, entitled "Record Subdivision Plan," does not contain the same requirement as 3.2 concerning contiguous land of the applicant that may be subdivided in the future, and thus cannot explain the inclusion of Parcel A on the Partridge Hill I subdivision map.
Woodworth stated his opinion in part as follows:
 "Parcel A would not meet the Subdivision Regulations as the private drive serves five drives which is the maximum allowed. So we were not intending to have that as part of the subdivision. It doesn't have any soil tests on it, building lines non [sic] of the requirements of the Subdivision Regulations of the Town of Guilford. . .[T]he resubdivision regulation states the, actually specifies, an approved building lot. You create additional lots from an approved building lot, Parcel A is not an approved building lot."
The PZC determined that the Partridge Hill II proposal constituted a "subdivision." Section 8-26 gives the PZC the authority to decide, in the first instance, whether a proposal constitutes a "subdivision" or a "resubdivision." Conn. Gen. Stat. 8-26. "The trial court may not substitute its judgment for the wide and liberal discretion vested in the local authority when CT Page 3299 acting within its prescribed legislative powers." Frito-Lay, Inc. v. Planning Zoning Commission, 206 Conn. 554, 572-73 (1988) (citations omitted). The "court may grant relief on appeal only where the local authority has acted illegally or arbitrarily or has abused its discretion." Id. at 573.
Courts "must be scrupulous not to hamper the legitimate activities of civil administrative boards by indulging in a microscopic search for technical infirmities in their action." Id. The agency's decision must be upheld if it is supported by the record. Primerica v. Planning Zoning Board, 211 Conn. 85,96 (1989). "The question is not whether the trial court would have reached the same conclusion but whether the record before the agency supports the decision reached." Id. The evidence to support the agency's decision must be "substantial." Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 540 (1987).
"Although the interpretation of statutes is ultimately a question of law;. . .it is the well established practice of this court to `accord great deference to the construction given [a] statute by the agency charged with its enforcement."' Griffin Hospital v. Commission on Hospitals Health Care, 200 Conn. 489,496 (1986). "In applying the law to the facts of a particular case, the board is endowed with a liberal discretion. . . ." Spero v. Zoning Board of Appeals, 217 Conn. 435, 440 (1991). "The burden is on the plaintiff to demonstrate that the board acted improperly." Id.
Under the facts of this case and applicable law, it cannot be said that the PZC acted unreasonably in concluding that the applicants' proposal was a "subdivision."
The PZC, upon the substantial evidence before it, reasonably could conclude, as it did, that Parcel A, described in Partridge Hill I subdivision, was not a lot or part of said subdivision, that Partridge Hill II was a subdivision of said Parcel A into three lots and that Partridge Hill II was not a resubdivision of a lot or part of Partridge Hill I subdivision, or any other subdivision. There is nothing in the record to suggest that the PZC abused its discretion in not requiring hearing on the application for subdivision approval.
Accordingly, this court finds that plaintiffs have failed to prove by a fair preponderance of the evidence that the PZC acted illegally, arbitrarily or in abuse of its discretion in deciding that the application in issue is for a subdivision and not a resubdivision and that there need be no public hearing in the application in issue.
Plaintiffs claim that the PZC, in violation of its CT Page 3300 subdivision regulations 5.1, "waived the requirement of submission of a [Site Development Plan] without giving any reason for its action . . . [and it] made no finding of no significant impact on adjacent property as required by [said section]."
There is no support in the record for this claim.
Acting through their engineer, applicants requested a waiver of the "requirement for a separate Site Development Plan for the [subdivision in issue]"; this request was made because the "plans are of such a scale that all of the information required can be clearly depicted on one sheet, alleviating the practical need for a separate Record Map and Site Development Plan. . . ." The PZC allowed applicants to combine the site development plan with the record subdivision map. Such action by the PZC is not a violation of 5.1 of its Subdivision Regulations because the PZC implicitly found that all of the information required for a Site Development Plan is included in the plan submitted; the PZC waived only the submission of a Site Development Plan as a separate document.
Finally, plaintiffs claim that the PZC violated 8-25 (b) of the General Statutes because the applicants did not "mention whatsoever. . .the use of passive solar energy techniques. . .[and the PZC did not] require any such submission from" the applicants.
There is no support in the record to support this claim.
Pursuant to 8-25, the PZC "shall adopt regulations covering the subdivision of land" and said regulations "shall require any person submitting a plan for a subdivision . . . to demonstrate . . . that he has considered, in developing the plan, using passive solar energy techniques . . . ." Solar energy techniques are defined by said section as "site design techniques which maximize solar heat gain, minimize heat loss and provide thermol storage within building during the heating season and minimize heat gain and provide for natural ventilation during the cooling season"; "site design techniques shall include. . . (1) House orientation; (2 street and lot layout; (3) vegetation; (4) natural and man-made topographical features; and (5) protection of solar access within the development."
Upon the record before it, which includes lot coverage and total floor area requirements, the PZC and Town Engineer have determined that each of the proposed lots can "serve as adequate homesites" and that the subdivision, with the "waivers granted and the conditions imposed. . .meets the Subdivision Regulations. . . ." The record contains information regarding the five enumerated factors of "site design techniques" which the PZC presumably considered in performing its duty. Murach v. Planning and Zoning Commission, 196 Conn. 192, 205. CT Page 3301
Accordingly, the appeal is hereby dismissed.
RONALD J. FRACASSE, J.