ELECTRICAL CONTRACTORS, INC. *v.* BETTY L. TIANTI,
COMMISSIONER OF LABOR, ET AL.
(14335)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued March 24—decision released August 18, 1992

*Wesley W. Horton,* with whom were *Susan M. Cormier* and *Bruce H. Stanger,* for the appellant (plaintiff).

*William J. McCullough,* assistant attorney general, with whom were *Beth Z. Margulies,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Charles A. Overend,* assistant attorney general, for the appellees (defendants).

BERDON, J. The principal issue in this appeal is the determination of what constitutes a violation of General Statutes § 31-53[1] that would subject a public works

---

[1] General Statutes § 31-53 provides: "(a) Each contract for the construction, remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project by the state or any of its agents, or by any political subdivision of the state or any of its agents, shall contain the following provision: 'The wages paid on an hourly basis to any mechanic, laborer or workman employed upon the work herein contracted to be done and the amount of payment or contribution paid or payable on behalf of each such employee to any employee welfare fund, as defined in subsection (h) of this section, *shall be at a rate equal to the rate customary or prevailing for the same work in the same trade or occupation in the town in which such public works project is being constructed.* Any contractor who is not obligated

contractor to placement on what is commonly referred

by agreement to make payment or contribution on behalf of such employees to any such employee welfare fund shall pay to each employee as part of his wages the amount of payment or contribution for his classification on each pay day.'

"(b) Any person who knowingly or wilfully employs any mechanic, laborer or workman in the construction, remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project for or on behalf of the state or any of its agents, or any political subdivision of the state or any of its agents, at a rate of wage on an hourly basis which is less than the rate customary or prevailing for the same work in the same trade or occupation in the town in which such public works project is being constructed, remodeled, refinished, refurbished, rehabilitated, altered or repaired, or who fails to pay the amount of payment or contributions paid or payable on behalf of each such employee to any employee welfare fund, or in lieu thereof to the employee, as provided by subsection (a), shall be fined not more than one hundred dollars for each offense. In addition, if it is found by the contracting officer representing the state or political subdivision thereof that any mechanic, laborer or workman employed by the contractor or any subcontractor directly on the site for the work covered by the contract has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid as required by this section, the state or contracting political subdivision thereof may, by written notice to the contractor, terminate such contractor's right to proceed with the work or such part of the work as to which there has been a failure to pay said required wages and to prosecute the work to completion by contract or otherwise, and the contractor and his sureties shall be liable to the state or the contracting political subdivision for any excess costs occasioned the state or the contracting political subdivision thereby. The contracting department of the state or the political subdivision thereof shall within two days after taking such action notify the labor commissioner in writing of the name of the contractor or subcontractor, the project involved, the location of the work, the violations involved, the date the contract was terminated, and steps taken to collect the required wages.

"(c) The labor commissioner may make complaint to the proper prosecuting authorities for the violation of any provision of subsection (b).

"(d) For the purpose of predetermining the prevailing rate of wage on an hourly basis and the amount of payment or contributions paid or payable on behalf of each employee to any employee welfare fund, as defined in subsection (h), in each town where such contract is to be performed, the labor commissioner shall (1) hold a hearing at any required time to determine the prevailing rate of wages on an hourly basis and the amount of payment or contributions paid or payable on behalf of each employee to any employee welfare fund, as defined in subsection (h), upon any public work within any specified area, and shall establish classifications of skilled,

semiskilled and ordinary labor, or (2) adopt and use such appropriate and applicable prevailing wage rate determinations as have been made by the Secretary of Labor of the United States under the provisions of the Davis-Bacon Act, as amended.

"(e) The labor commissioner shall determine the prevailing rate of wages on an hourly basis and the amount of payment or contributions paid or payable on behalf of such employee to any employee welfare fund, as defined in subsection (h), in each locality where any such public work is to be constructed, and the agent empowered to let such contract shall contact the labor commissioner, at least ten but not more than twenty days prior to the date such contracts will be advertised for bid, to ascertain the proper rate of wages and amount of employee welfare fund payments or contributions and shall include such rate of wage on an hourly basis and the amount of payment or contributions paid or payable on behalf of each employee to any employee welfare fund, as defined in subsection (h), or in lieu thereof the amount to be paid directly to each employee for such payment or contributions as provided in subsection (a) for all classifications of labor in the proposal for the contract. The rate of wage on an hourly basis and the amount of payment or contributions to any employee welfare fund, as defined in subsection (h), or cash in lieu thereof, as provided in subsection (a), shall, at all times, be considered as the minimum rate for the classification for which it was established. Prior to the award of any contract subject to the provisions of this section, such agent shall certify in writing to the labor commissioner the total dollar amount of work to be done in connection with such public works project, regardless of whether such project consists of one or more contracts. Upon the award of any contract subject to the provisions of this section, the contractor to whom such contract is awarded shall certify, under oath, to the labor commissioner the pay scale to be used by such contractor and any of his subcontractors for work to be performed under such contract.

"(f) Each employer subject to the provisions of this section or section 31-54 shall keep, maintain and preserve such records relating to the wages and hours worked by each employee and a schedule of the occupation or work classification at which each mechanic, laborer or workman on the project is employed during each work day and week in such manner and form as the labor commissioner establishes to assure the proper payments due to such employees or employee welfare funds under this section or section 31-54. The provisions of sections 31-59 (a), 31-59 (b), 31-66 and 31-69 which are not inconsistent with the provisions of this section or section 31-54 shall apply to this section.

"(g) The provisions of this section shall not apply where the total cost of all work to be performed by all contractors and subcontractors in connection with new construction of any public works project is less than two hundred thousand dollars or where the total cost of all work to be performed

## utes § 31-53a.[2] Pursuant to § 31-53a, any person or firm

by all contractors and subcontractors in connection with any remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project is less than fifty thousand dollars.

"(h) As used in this section, section 31-54 and section 31-89a, 'employee welfare fund' means any trust fund established by one or more employers and one or more labor organizations to provide from moneys in the fund, whether through the purchase of insurance or annuity contracts or otherwise, benefits under an employee welfare plan; provided such term shall not include any such fund where the trustee, or all of the trustees, are subject to supervision by the commissioner of banking of this state or any other state or the Comptroller of the Currency of the United States or the board of governors of the Federal Reserve System, and 'benefits under an employee welfare plan' means one or more benefits or services under any plan established or maintained for employees or their families or dependents, or for both, including, but not limited to, medical, surgical or hospital care benefits; benefits in the event of sickness, accident, disability or death; benefits in the event of unemployment, or retirement benefits." (Emphasis added.)

[2] General Statutes § 31-53a provides: "(a) The state comptroller or the contracting authority acting pursuant to section 31-53 is hereby authorized and directed to pay to mechanics, laborers and workmen from any accrued payments withheld under the terms of a contract terminated pursuant to subsection (b) of section 31-53 any wages found to be due such mechanics, laborers and workmen pursuant to said section 31-53. *The labor commissioner is further authorized and directed to distribute a list to all departments of the state and political subdivisions thereof giving the names of persons or firms whom he has found to have disregarded their obligations under said section 31-53 to employees and subcontractors or to have been* barred from federal government contracts in accordance with the provisions of the Davis-Bacon Act, 49 Stat. 1011 (1931), 40 USC § 276a-2. *No contract shall be awarded by the state or any of its political subdivisions to the persons or firms appearing on this list or to any firm, corporation, partnership, or association in which such persons or firms have an interest until three years have elapsed from the date of publication of the list containing the names of such persons or firms.*

"(b) If the accrued payments withheld under the terms of a contract terminated pursuant to subsection (b) of section 31-53 are insufficient to reimburse all the mechanics, laborers and workmen with respect to whom there has been a failure to pay the wages required pursuant to said section 31-53, such mechanics, laborers and workmen shall have the right of action and of intervention against the contractor and his sureties conferred by law upon persons furnishing labor or materials, and in such proceedings it shall be no defense that such mechanics, laborers and workmen accepted or agreed to accept less than the required wages or that such persons voluntarily made refunds." (Emphasis added.)

appearing on such a list shall not be awarded a contract by the state for a three year period. In this appeal, the defendant deputy commissioner of labor, Lawrence S. Fox (deputy commissioner), in lieu of the defendant commissioner of labor, Betty L. Tianti (commissioner), who disqualified herself, determined that the plaintiff, Electrical Contractors, Inc., was subject to placement on the debarment list because it had disregarded its obligations under § 31-53, the prerequisite for debarment. The trial court dismissed the plaintiff's appeal,[3] and we reverse.

The following facts are not disputed. On June 11, 1986, the plaintiff entered into a contract with the state of Connecticut to install electrical smoke and fire alarms in dormitories at the University of Connecticut in Storrs (UConn project). The plaintiff signed a "Contract or Wage Certification Form" certifying that it and its subcontractors would pay all employees on the UConn project the appropriate wages as listed in the schedule of prevailing wage rates, which was attached to the form. The commissioner set the schedule of prevailing wage rates on the basis of the federal schedule of prevailing wage rates, which has been the basis for determining rates for public works contracts since 1977. The prevailing rate schedule for the UConn project contained an hourly wage rate for each job classification, as well as a separate amount under each classification for total benefits.

The plaintiff commenced work on the UConn project in March, 1987. A short time later, the plaintiff learned that it would have to suspend work from May 9 to May 18, 1987, a period encompassing six working days, to minimize noise while the students prepared for final

[3] The plaintiff appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

exams. As a consequence, the plaintiff proposed the following to its employees: (1) that they work forty-eight hours per week, beginning with the week ending March 21, 1987, and continuing for six consecutive weeks; (2) that they be paid for forty hours of work for each of these forty-eight hour work weeks; and (3) that they receive regular pay for the extra hours worked when the job was shut down and no work was performed. The employees were informed that if they chose not to accept the proposal, they would be placed at another job site. Twelve of thirteen employees agreed to accept the proposal.

As a result, the plaintiff had its employees work forty-eight hours a week for seven weeks[4] to replace the seven working days that would be missed during the shut down period. The plaintiff kept three sets of records, one accurately disclosing the time worked and two incomplete sets, each showing only partial hours worked per week. As for the eight registered apprentices on the UConn project, the plaintiff calculated their pay by adding the journeyperson's wage rate to the amount of total benefits and multiplying that amount by the percentage applicable to each apprentice.

Subsequently, one of the plaintiff's employees on the UConn project signed an affidavit stating that he and other employees had worked forty-eight hours per week during this period but had been paid only for forty hours. The affidavit was delivered to the defendant department of labor (department), which commenced an investigation. As a result of the investigation, the department initiated hearings.

---

[4] Before May 9, 1987, it was learned that the UConn project would shut down on May 8, 1987, and not May 9, 1987. The employees who agreed to the plan worked an additional Friday to compensate for that missed day. The total shutdown, therefore, equalled seven working days, from May 8, 1987, to May 18, 1987.

The hearing officer determined that the plaintiff had violated § 31-53a by disregarding its obligations under § 31-53 to its employees in that it failed to pay them overtime for time worked in excess of forty hours per week for a seven week period, had failed to pay its apprentice employees 100 percent of the total benefits rate, and had failed to keep true and accurate records. The total amount found to be due to the employees was $5376.19. The plaintiff complied with the department's order to reimburse its employees the amount owed. The deputy commissioner adopted the findings of facts and decision of the hearing officer and ordered the name of the plaintiff's firm to appear on the debarment list. No other firm had previously been placed on this list.

The plaintiff appealed the decision of the deputy commissioner to the Superior Court. The trial court affirmed the deputy commissioner's decision and dismissed the plaintiff's administrative appeal. The court rejected the plaintiff's claim that the word "disregard," for the purpose of debarment pursuant to § 31-53a, requires willful or knowing conduct. The court then held that the plaintiff had disregarded its obligations under § 31-53 by (1) not paying its employees overtime wages, (2) failing to pay its apprentices the proper amount, and (3) failing to keep true and accurate records. The trial court further concluded that the commissioner had properly adopted the applicable federal wage rate determinations. Lastly, the court rejected the plaintiff's argument of selective prosecution.

In this appeal, the plaintiff essentially pursues the claims that it raised before the trial court. We affirm the trial court's conclusion that the commissioner needs to find only that a firm negligently disregarded its obligations in order to trigger debarment under § 31-53a. We reverse the trial court's conclusion that the plaintiff's failure to pay overtime wages constituted a vio-

lation of § 31-53 (a) in that overtime is a rate "customary or prevailing" for the same work as that done on the UConn project. We reverse the trial court's conclusion that the plaintiff was put on notice as to the proper computation of apprentice wage rates. Because we agree with the trial court that the plaintiff failed to keep and maintain true and accurate records, we conclude that on remand the commissioner must determine whether that violation alone is a sufficient ground for debarment under § 31-53a.[5]

[5] The contours of our remand make it unnecessary for us to reach the merits of the plaintiff's remaining claims that (1) the commissioner improperly failed to adopt the federal prevailing wage rate determinations and the federal regulations pursuant to General Statutes § 4-168 of the Uniform Administrative Procedure Act (UAPA), and (2) the commissioner selectively prosecuted the plaintiff thereby violating its right to equal protection under the fourteenth amendment to the United States constitution.

As for the first claim, General Statutes § 31-53 (f) requires employers such as the plaintiff to "keep, maintain and preserve" proper records. This duty is expressly created by statute and, therefore, the commissioner did not need to promulgate a regulation for this purpose. Because we conclude that the plaintiff's record keeping violation was the only violation that could have triggered debarment under the circumstances of this case, we need not address whether the commissioner improperly failed to adopt regulations under the statute in accordance with the UAPA.

As for the plaintiff's second claim, the plaintiff makes two arguments to this court stemming from the trial court's dismissal of its claim of selective prosecution. It argues that the trial court improperly denied its motion to hear additional evidence on the issue of selective prosecution. Alternatively, the plaintiff argues that even if it were not entitled to introduce additional evidence, the administrative record is sufficient to make a prima facie showing of selective prosecution. Although we agree with the plaintiff that additional evidence is necessary for a proper determination of this issue, we need not review this claim further because, when the present case is remanded to the department on the record keeping issue, the plaintiff may receive the relief sought. If, however, the commissioner determines that the record keeping violation warrants its placement on the debarment list, then, of course, the plaintiff may take an administrative appeal to the trial court. If it does so, then the trial court must afford the plaintiff the opportunity to present additional evidence on the issue of selective prosecution. See General Statutes (Rev. to 1987) § 4-183 (f). (The 1987 statutory provision is applicable, rather than the current provision, because the underlying agency proceeding commenced in 1987. General Statutes § 4-185; *Vernon Village, Inc.* v. *Carothers,* 217 Conn. 130, 140, 585 A.2d 76 [1991].)

## I

## "Disregard" of the Plaintiff's Obligation

The plaintiff first claims that any alleged violations of § 31-53 did not warrant debarment because they were not intentional or willful. Section 31-53a authorizes and directs the labor commissioner to place on the debarment list the names of any firm "found to have disregarded their obligations under said section 31-53 to employees and subcontractors . . . ." Relying on the definition of "disregard" in Black's Law Dictionary (5th Ed.), the trial court concluded that an employer "disregards his obligations to employees within the meaning of the § 31-53a when he ignores, overlooks or fails to observe such obligations." Although the plaintiff agrees with this definition, it nonetheless claims that the trial court improperly construed the word to include violations that are not intentional or willful. We disagree with the plaintiff.

The trial court properly accorded the word "disregard" its common, everyday definition. "Words and phrases of a statute are to be construed according to the commonly approved usage of the language." *Ganim v. Roberts,* 204 Conn. 760, 763, 529 A.2d 194 (1987); see General Statutes § 1-1 (a). To support its position, the plaintiff claims that a different dictionary, the American Heritage Dictionary of the English Language, Second College Edition (1991), should be followed. The American Heritage Dictionary of the English Language defines "disregard" under its noun definition to mean "lack of thoughtful attention or due regard, esp. when willful." Even the plaintiff's definition, however, includes negligent conduct. Moreover, the plaintiff conceded at oral argument that its preferred construction of "disregard" as only willful conduct is strained. Accordingly, we adopt the commonly

approved definition of "disregard," which does not require intentional or willful conduct.

The plaintiff also argues that if we condition debarment on conduct that is neither intentional or willful, we would leave employers open to the drastic sanction of debarment for a minor error of a few dollars. The answer is that if the legislature had wished to condition debarment on intentional or willful conduct, then it could have said so. See *Buonocore* v. *Branford,* 192 Conn. 399, 403, 471 A.2d 961 (1984). For example, in subsection (b) of § 31-53, the legislature specifically required a finding that an employer "knowingly or willfully" employed workers at a wage rate less than the customary or prevailing rate before the employer would be subject to a fine. Furthermore, under such drastic circumstances the employer would still have recourse to the argument that the commissioner had acted arbitrarily and capriciously. We agree, therefore, with the trial court that conduct that is merely negligent will suffice to support a finding that an employer disregarded its obligations under § 31-53 in order to trigger debarment under § 31-53a.

## II

### FAILURE TO PAY OVERTIME WAGES

We turn next to the plaintiff's claim that the failure to pay overtime wages, although a violation of General Statutes § 31-76c,[6] does not constitute a failure to pay the customary or prevailing wage rate pursuant to § 31-53 (a) and, therefore, does not call for the sanction of debarment. The trial court, however, agreed with the commissioner that the payment of overtime

---

[6] General Statutes § 31-76c provides: "No employer, except as otherwise provided herein, shall employ any of his employees for a workweek longer than forty hours, unless such employee receives remuneration for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

wages is *customary* in the plaintiff's trade and, therefore, any overtime violation is a violation of the employer's obligation under § 31-53 (a). The plaintiff argues that even though it violated § 31-76c by failing to pay overtime wages, overtime is neither expressly incorporated in § 31-53 as a "customary" wage rate, or impliedly incorporated by reference in § 31-53 (f) to a different statute. We agree with the plaintiff.

Section 31-53 (a) requires that employees in public works projects receive wages "at a rate equal to the *rate customary or prevailing* for the same work in the same trade or occupation in the town in which such public works project is being constructed." (Emphasis added.) The plaintiff argues that the plain language of the statute indicates that the phrase "customary or prevailing" constitutes a unitary term, with both words having the same meaning. The commissioner argues that the words "customary" and "prevailing" within the phrase "customary or prevailing" mean different things. We agree with the plaintiff for the following reasons.

First, subsection (a) of § 31-53 refers to "rate" in the singular, thereby indicating that there is only one rate, not a "customary rate" and a "prevailing rate." Second, the commissioner received her authority to determine the prevailing rate of wage under § 31-53 (d). Subsection (d) authorizes the commissioner to determine only the "prevailing rate of wage." The statute does not provide comparable methods for determining what would constitute a "customary rate of wage." Subsection (e), the certification procedure, lends itself to the same construction. This subsection requires every contractor on a public works project to "certify, under oath, to the labor commissioner the pay scale to be used by such contractor . . . ." The commissioner concedes that the "Contractor Wage Certification Form," supplied by the commissioner and signed by

the plaintiff, pertained to the prevailing rate only and did not include overtime rates. Moreover, subsection (e) states that the hourly rate of wage and the benefits contribution or payment shall be considered the "minimum rate," and there is no mention of overtime calculations as forming a part of this minimum rate. Indeed, except for subsections (a) and (b), which refer to the "customary or prevailing" wage rate, the gravamen of the statute focuses on the prevailing rate of wage.

Third, we are not persuaded by the commissioner's argument that the reference in subsection (f) of § 31-53 to the investigative provisions of General Statutes § 31-59 and the enforcement provisions of General Statutes § 31-69 impliedly incorporate the overtime provisions of General Statutes § 31-60. This is reading something into the statute that is not there. We decline to follow such a tortuous analysis because it ignores the plain language of subsection (f), which incorporates only those provisions listed. "Our role is to construe legislation as we find it, regardless of whether we think it might have been improved or a preferable result reached by the inclusion of other provisions." *Galullo* v. *Waterbury,* 175 Conn. 182, 186, 397 A.2d 103 (1978); see also *American-Republican, Inc.* v. *Waterbury,* 183 Conn. 523, 529, 441 A.2d 23 (1981).

Moreover, the Davis-Bacon Act; 40 U.S.C. § 276a-2; which the department claims is the model for § 31-53, does not include overtime wages as a factor in determining the prevailing wage obligation. The federal regulations confirm that the obligation to pay overtime wages is made on the basis of other statutes: "The [Davis-Bacon Act] excludes amounts paid by a contractor or subcontractor . . . in the computation of overtime under the Fair Labor Standards Act, the Contract Work Hours and Safety Standards Act, and the Walsh-Healey Public Contracts Act whenever the overtime

provisions of any of these statutes apply concurrently with the Davis-Bacon Act or its related prevailing wage statutes." 29 C.F.R. § 5.32 (a). That the Davis-Bacon Act does not include payment for overtime obligations is persuasive authority for our interpretation of what is required in regard to the payment of the prevailing rate of wage. See *Ox Ridge Hunt Club, Inc.* v. *Tax Commissioner,* 175 Conn. 90, 93, 394 A.2d 194 (1978).

On the basis of our construction of the statute, we hold that overtime is not a "customary or prevailing" wage obligation under § 31-53. It is important to note that there are remedies and penalties independent of the debarment statute for violations of overtime hours and wages. General Statutes §§ 31-68 and 31-69 provide both a civil remedy and criminal penalties for such violations. We conclude that the trial court incorrectly affirmed the decision of the deputy commissioner that the plaintiff "disregarded" its obligations under § 31-53 when it committed a violation of the overtime statutes. Accordingly, the decision of the deputy commissioner to place the plaintiff on the debarment list cannot be premised on the plaintiff's admitted violation of the overtime provisions of § 31-76c.

### III

#### APPRENTICE WAGES

The plaintiff next claims that the trial court improperly concluded that the plaintiff's method of calculating payment to its eight registered apprentices on the UConn project was a ground for placing it on the debarment list. The trial court affirmed the deputy commissioner's conclusion that the plaintiff should have calculated the apprentices' pay on the basis of a percentage of the journeyperson's wages, *plus the full amount of the journeyperson's "total benefits."* Instead, the plaintiff argues that it paid the apprentices on the basis of *a percentage of both* the hourly rate and total

benefits because it was not put on notice as to the proper method of calculation.[7] We agree with the plaintiff.

Neither §§ 31-53 and 31-53a nor the regulations enacted thereunder mention apprentice wages. We first look, therefore, to the federal prevailing wage rate determinations as adopted by the commissioner pursuant to § 31-53 (d). The schedule of prevailing rates required for the UConn project stated: "Apprentices duly registered . . . are allowed to be paid *the appropriate percentage of the prevailing [journeypersons] rate,* provided the work site ratio shall not be less than one full-time journey-person instructing and supervising the work of each apprentice in a specific trade." (Emphasis added.) Although the trial court found the prevailing wage rate schedule to be unclear as to apprenticeship wages, both the plaintiff and the commissioner claim that its plain language supports their conflicting positions.

The plaintiff claims that the prevailing wage rate schedule authorized its method of calculating apprentice wages. The schedule contains two columns of figures: (1) the prevailing rates of wages (hourly rate); and (2) the employee welfare contributions (total benefits). The first paragraph of the prevailing wage rate schedule states that employers who are not required

---

[7] For example, the prevailing wage rate for a journeyperson electrician ($18.20) was added to the "total benefits" rate ($5.35 plus 3.5 percent or .64 = $5.99) for a total of $24.19. The plaintiff calculated that a 60 percent apprentice would receive 60 percent of that figure, or $14.51, as his or her hourly wage. The department of labor investigator determined that this method of calculation was improper and a violation of General Statutes § 31-53 because the statute requires multiplying the prevailing wage rate by the appropriate percentage, *and then adding* the full "total benefits" rate. In the above example, the commissioner concluded that the prevailing wage rate ($18.20) should have been multiplied by 60 percent ($10.92) and then the full fringe benefits rate ($5.99) should have been added for a total of $16.91 instead of $14.51.

to pay employee welfare contributions to a welfare and pension fund must pay that amount directly to each employee as part of his or her hourly wage. The plaintiff argues that, therefore, the schedule itself combines the total benefits and hourly rates into one hourly wage under certain circumstances. That being the case, the plaintiff argues, then the schedule, in its authorization to employers to pay apprentices "the appropriate percentage of the prevailing [journeypersons] rate," must regard the "rate" as a combination of the hourly rate plus the total benefits.

Conversely, the commissioner claims that the prevailing wage rate schedule is equally clear in its mandate that apprentices shall receive 100 percent of the fringe benefits. The commissioner argues that the wage rate determinations of the United States secretary of labor under the Davis-Bacon Act and other related acts, which were adopted by the commissioner, include both a "basic hourly rate" and a "fringe benefits"[8] amount, in separate columns, for each job classification. Similarly, the state's prevailing wage rate schedule issued to the plaintiff for the UConn project differentiates between the "hourly rate" and the "total benefits" amount for each job classification. The commissioner argues that the figures are separate to show that the two columns should not be combined when determining the apprenticeship wages. Moreover, the commissioner reads the plain language of the sentence directing the payment of the welfare and pension fund directly to the employees in certain circumstances to require that the actual amount listed in the "total benefits" column be paid to each employee. The commissioner states that it is significant that the term "rate" is used only with respect to the hourly rate and not to

---

[8] In this appeal, the parties do not distinguish between the meaning of "total benefits" and "fringe benefits." For the purposes of this section, therefore, we will treat them as synonymous.

the amount of total benefits. Therefore, according to the commissioner, when the prevailing wage rate form stated that "apprentices . . . [are] allowed to be paid the appropriate percentage of the prevailing [journeypersons] rate," it can be read so as to include "hourly rates" only and not "total benefits" because they are not listed as a "rate."

We agree with the trial court that the language of the prevailing wage rate form that was supplied by the commissioner was not sufficiently clear for the commissioner to claim now that the plaintiff was aware of the proper computation of apprentices wages. Accordingly, we will turn to the other sources relied upon by the trial court in its affirmance of the deputy commissioner's finding that the plaintiff had notice of the appropriate method to pay apprentices.

In 1983, the office of job training, the designated state apprenticeship agency under the department, sent the plaintiff copies of three virtually identical letters for different projects. The trial court held that the letters establish the required payment method proposed by the department. Because we conclude that the letters, alone, were insufficient to put the plaintiff on notice as to the correct payment procedure for the apprentice wages, we reverse the trial court.

First, the letters are not clear on their face. Each letter contained the names of the registered apprentices for the project and stated: "The apprentices must be paid the percentage of the program completion rate which is $8.00 or the project [journeyperson's] rate, whichever is higher, plus the amount of fringe benefits listed on the wage determination for the classification." The trial court concluded that the word "percentage," as used in the letters, applied only to the program completion rate of $8 or the journeyperson's rate ([% × $8] + fringe benefits). It is a reason-

able interpretation, however, that the word "percentage" applies also to the end of the sentence reading "plus the amount of fringe benefits listed" (% [$8 + fringe benefits]). If that is the case, then the plaintiff's method of calculating apprenticeship wage rates could have been proper.

Second, the reference to the federal regulations do not definitively establish the proper method. Each letter concluded with a statement that "[e]ach apprentice program sponsor must meet the requirements of [the] Labor Department regulations on Equal Opportunity in Apprenticeship per CFR 29 Part 5." The letters apparently referred the plaintiff to 29 C.F.R. § 5.5 (a) (4) (iii), which is entitled "Equal employment opportunity," and states that "[t]he utilization of apprentices, trainees and [journeypersons] under [part five] shall be in conformity with the equal employment opportunity requirements. . . ." This section, § 5.5 (a) (4) (iii), is the only section in 29 C.F.R. part five that has reference to equal employment opportunities. This section, however, says nothing about the proper calculation of apprenticeship wages or fringe benefits.[9] Accordingly, we conclude that the three letters sent to the plaintiff did not express the department's required method of calculating apprenticeship wages.

Third, the method the plaintiff used to calculate apprentice wages on the UConn project was the same method it had used in 1984 on other state projects. The labor department reviewed the wage records on those projects and did not object to this method of determin-

[9] To hold to the contrary, we would have to conclude that the commissioner was authorized to adopt *all* the federal regulations in 29 C.F.R., part five. This, we cannot do. General Statutes § 31-53 (d) authorizes the commissioner to "adopt and use *such appropriate and applicable prevailing wage rate determinations* as have been made by the Secretary of Labor of the United States . . . ." (Emphasis added.) The plain language of the statute authorizes the commissioner to adopt only those federal regulations pertaining to the prevailing wage rated determinations.

ing payments to the apprentices. The plaintiff argues that although the department reviewed the plaintiff's wage records for prevailing wage rate violations, it found no violations. The plaintiff claims on appeal that the trial court mischaracterized this argument as one of estoppel. Although this evidence would not prove estoppel, we agree with the plaintiff that it demonstrates, at a minimum, the department's own confusion as to the proper method of paying apprentices. We conclude that the plaintiff was not put on notice by the department about the proper calculation of apprentice wage rates. We hold, therefore, that the commissioner may not use the plaintiff's alleged violation of apprentice wage rates as a ground for placing the plaintiff on the debarment list.

IV

FAILURE TO KEEP PROPER RECORDS

The plaintiff also claims that the trial court improperly affirmed the deputy commissioner's conclusion that the plaintiff disregarded its obligation under § 31-53 because of its failure to keep and maintain true and accurate wage and hour records. The deputy commissioner and the court premised their holding on the following facts found by the hearing officer. The plaintiff's foreperson at the UConn project job site maintained three separate sets of records regarding hours worked. One set of records, known as goldenrods, indicated that the employees worked forty hours a week, Monday through Thursday, from March 28, 1987, through May 2, 1987. The second set of goldenrods indicated that employees worked eight hours on Fridays during that time. A third set of records, called the black and white log book, properly reflected the actual time the employees worked. The payroll registers improperly indicated

that the employees had been paid (1) for forty hours when, in fact, no work had been performed, and (2) for forty hours for the weeks in which the employees had worked forty-eight hours. The time cards were also inaccurate. When the investigation against the plaintiff commenced, the plaintiff initially showed the department the inaccurate goldenrods.

On appeal, the plaintiff makes three arguments: (1) because the records failed to show the amount of overtime worked, which is not a prevailing wage rate violation, the violation did not constitute a violation under § 31-53; (2) an employer does not disregard its obligations "to employees" if it disregards its record keeping duties under § 31-53 (f); and (3) a record keeping violation of § 31-60-12 of the Regulations of Connecticut State Agencies does not constitute a violation of § 31-53 (f). We disagree with each of the plaintiff's claims.

A

The plaintiff first claims that if we conclude that overtime violations do not constitute a prevailing wage rate violation under § 31-53, any error in the records pertaining to overtime cannot be a basis for debarment under § 31-53a. We disagree with the plaintiff. Section 31-53 (f) imposes on public work contractors an independent duty to keep and maintain true and accurate records "relating to the wages and hours worked by each employee . . . in such manner and form as the labor commissioner establishes to assure the proper payments due to such employees . . . under [§ 31-53] . . . ." Although the legislature is seeking to assure proper payment under § 31-53, the plain language of subsection (f) refers to *all* the wages and *all* the hours worked, which, of course, includes overtime wages and hours. Records that reflect hours *not* worked, as well

as records that do not reflect the actual hours worked, constitute a violation of the record keeping provision of § 31-53 (f) because, without accurate records, there can be no assurance that the employees are receiving proper payment under § 31-53.

### B

The plaintiff next claims that the language of § 31-53a limits debarment to employers who "disregard" their obligations "to employees," and that record keeping violations do not constitute such an obligation to employees. Therefore, the plaintiff argues that it cannot be placed on the debarment list for a record keeping violation. We disagree.

Although § 31-53a does not define "obligations to employees," § 31-53a-1 (b) of the Regulations of Connecticut State Agencies does not distinguish between "obligations to employees" and other obligations. Section 31-53a-1 (b) defines "disregarded their obligations" to include a failure to keep records as required by § 31-53.[10] In this instance, we accord great deference to the "agency's interpretation of its own duly adopted regulations." *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 497, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). Accordingly, the plaintiff disregarded its obligations to its employees when it failed to keep accurate records regarding the employees' overtime wages and hours.

### C

The plaintiff also claims that a record keeping violation of § 31-60-12a of the Regulations of Connecticut

---

[10] Section 31-53a-1 (b) of the Regulations of Connecticut State Agencies provides in relevant part: " 'Disregarded their obligations' means . . . the failure to keep, maintain and preserve such records relating to the wages and hours worked by each employee [on any public works project]."

State Agencies, upon which the commissioner relies, does not constitute a violation of § 31-53 (f). The parties agree that the commissioner has not promulgated any record keeping regulations under § 31-53 (f). General Statutes § 31-66, which is expressly incorporated in § 31-53 (f), requires that "[e]ach employer . . . shall keep . . . a true and accurate record . . . *as required by the applicable regulations issued by the labor commissioner* . . . ." (Emphasis added.) Section 31-66 is included in part I of chapter 558 of the General Statutes. General Statutes § 31-60, which is also in part I of chapter 558, authorizes the commissioner, after appropriate consultations, to adopt regulations for all of part I of chapter 558.

Pursuant to § 31-60, the commissioner promulgated § 31-60-12 (a) and § 31-60-12 (c) of the Regulations of Connecticut State Agencies, which require, inter alia, that the employer keep true and accurate records for each employee for three years and that those records include each employee's total weekly hours, his total hourly, daily or weekly wages, his overtime wage as a separate item from his basic wages, and his total wages paid each pay period. Because § 31-66 is incorporated by reference in § 31-53 (f), and because the regulations adopted pursuant to § 31-60 are applicable to § 31-66, the regulation requirement of subsection (f) is clearly satisfied by the adoption of § 31-60-12 (a) et seq. There is no need for the commissioner to adopt separate record keeping regulations that address only § 31-53.

We hold, therefore, that the plaintiff violated its obligation to keep and maintain true and accurate records under § 31-53 (f). We conclude that on remand the commissioner must determine whether the types of violations that the plaintiff committed in regard to record keeping should subject the plaintiff to debarment.

The judgment is reversed and the case is remanded to the trial court with direction to remand the case to the commissioner for further proceedings consistent with this opinion.

In this opinion the other justices concurred.