[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The following decision was originally entered orally on the record on September 23, 2002. At that time, all counsel were present. A signed copy of the transcript is in the Court file. This Memorandum of Decision contains edits and citations which have been added.
Findings
The Court makes the following findings concerning this case:
The primary defendant is the Connecticut Light and Power Company, since it is the primary constructor and service provider for this project. The court has already granted a Motion to Dismiss filed by the defendant Northeast Utilities Service Company.
The plaintiff commenced this appeal from a decision of the Department of Public Utility Control (DPUC) by filing a request for an ex parte stay of the DPUC orders. The DPUC orders allowed the defendant, Connecticut Light and Power Company (CLP), to upgrade pole lines on the west side of Peterson Way, in South Windsor, to install taller poles and transmission lines for twenty-three KV circuits.
The land on the west side of Peterson Way is owned by the town of South Windsor, (the town hall and library property) in part, and in part by the plaintiff Wapping Community Church, Incorporated. The road is a public street maintained by the town of South Windsor.
The DPUC, at the administrative hearing level, denied CLP's motion to dismiss regarding the individual property owners on the east side of Peterson Way. The DPUC granted those property owners status as adjoining proprietors. That action required CLP to either receive consent from the homeowners to complete the project or, in the alternative, the DPUC must decide, after a hearing, if the project should continue, and if so, in CT Page 12833 what manner.
The plaintiffs, asked the DPUC for a permanent injunction. This meant that the DPUC had to examine the project and alternatives presented as if they were being asked to consider the feasibility of the entire project. The DPUC undertook that responsibility.
The plaintiff Wapping Community Church requested and was granted intervening party status on May 13th 2002.
The primary purpose of the project is to provide reliable electrical service to customers in the town of Manchester. The service, however, runs through the town of South Windsor.
The existing poles along Peterson Way will be removed and replaced by taller poles. Tree trimming will be required. The purpose of the taller poles is to comply with current standards of the National Electric Safety Code.
CLP received permission to trim and remove trees from the town of South Windsor, on a portion of the west side of Peterson Way. CLP also originally received permission from the Wapping Church to trim and remove trees. This was before the church intervened as a party to the action. The Church now opposes the project, according to the findings of the DPUC.
The town of South Windsor not only supports the proposed construction, the town strenuously opposes any alternative that would run the new wires and poles along Sullivan Avenue from Route 74 south to Oakland and Buckland Roads.
The plaintiffs appealed from the proposed draft decision of the DPUC. The plaintiffs amended their appeal and their petition on September 23, 2002, to serve as an appeal from the DPUC's final decision dated August 28, 2002.
The defendant CLP stipulated at the DPUC hearing and again at the court hearing that if the plaintiffs are ultimately successful in their appeal, CLP will restore the poles and wires on Peterson Way to their present condition.
Issue
The decisive question at this hearing is a limited one. That question is whether this Court should dissolve the ex parte stay granted by Judge CT Page 12834 Sullivan on August 27, 2002 which stayed the DPUC's proposed orders, (which later became the final orders of the DPUC). The effect of granting the stay would be to halt the construction until the appeal is decided or some other court takes action.
Law
"The principal purpose of a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits." Rustici v. Malloy, 60 Conn. App. 47, 56,758 A.2d 424, cert. denied, 254 Conn. 952, 762 A.2d 903 (2000). "The issuance of an injunction is the exercise of an extraordinary power which rests within the sound discretion of the court." (Internal quotation marks omitted.) Silitschanu v. Groesbeck, 208 Conn. 312. 318, 543 A.2d 737
(1988).
The party seeking an injunction or a stay must prove irreparable harm and that they have no adequate remedy at law. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law . . ." Tighe v. Town of Berlin, 259 Conn. 83,86 (2002). The plaintiff has the burden of proving that there is a substantial probability that irreparable harm will occur. "Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." Id. At 87.
Our Supreme Court requires a trial judge to use the balancing of theequities test to determine if a stay should be granted pending an appeal from an administrative agency. The balancing of the equities test is defined as "a test which weighs the equities and balances the harm that may be suffered by the [a]ppellant as a result of the enforcement of the [algency order, or the decision, pending the appeal, against the public harm that may result from the delaying the effectiveness of the [o]rder or [d]ecision." Griffin Hospital v. Commission on Hospitals, 196 Conn. 451,455 (1985).
The trial court must consider the following: "[T]he likelihood the appellant will prevail [on the appeal] . . . the irreparability of the injury to be suffered from immediate implementation of the agency order . . . the effect of the stay upon other parties to the proceeding . . . and the public interest involved." Id. at 456.
[Note: The following was inadvertently left out of the oral opinion entered on the record. The Court includes it in this decision, because these issues were raised by the plaintiffs.] CT Page 12835
As grounds for appeal, the plaintiffs allege that the "administrative findings, inferences, conclusions and decisions as set forth in the [draft] DPUC decision are: (a) in violation of the Petitioners' constitutional and statutory rights; (b) in excess of the statutory authority of the DPUC; (c) made upon unlawful procedure; (d) arbitrary and capricious and . . . clearly erroneous in view of the reliable, probative and substantial evidence on the record." (Appeal, ¶¶ 28 (a)- (e).) Although the plaintiffs have yet to file a memorandum of law in support of their appeal, the arguments in the plaintiffs' briefs and exceptions filed in the underlying administrative proceeding shall frame the court's analysis of the issue of whether the plaintiffs are likely to succeed on appeal.
The plaintiffs first argue that the department's decision violates General Statutes § 16-234 because CLP never technically "applied" for permission to construct the subject utility lines. The plaintiffs argue, essentially, that because the underlying administrative proceeding was initiated by the plaintiffs' application for emergency relief, "the department's proposal to authorize construction exceeds the scope of the hearing and the issues submitted to the department for consideration." (Appeal, Exhibit C, p. 1.)
The plaintiffs cite no authority for their position that the DPUC acted outside the scope of its authority because CLP never submitted a formal application. Moreover, contrary to the plaintiff's argument, the plaintiffs' application for emergency relief expressly submitted the issue ultimately decided by the department. Specifically, the petitioners requested that the DPUC grant "[a]n ex parte order restraining and enjoining [CLP] from conducting any construction activities until the company has complied with the provisions of Section 16-234." Petitioners also requested "[a] hearing with respect to the petitioners' request for a permanent order enjoining and barring [CLP] from carrying out the proposed construction activities." (ROR, Item I-1.) Moreover, General Statutes § 4-177, which governs administrative hearings, provides simply that "[i]n a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice. The notice shall be in writing and shall include: (1) a statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; and (4) a short and plain statement of the matters asserted. . . ." There is no allegation in the present appeal that the DPUC did not comply fully with § 4-177. Moreover, our Supreme Court has repeatedly held that an agency's compliance with § 4-177 notice requirements satisfies the due process CT Page 12836 requirements of the Connecticut and United States constitutions. See, e.g., Pet v. Dept. of Health Services, 228 Conn. 651, 661, 638 A.2d 6
(1994) (Holding that the procedures required by the UAPA exceed the minimal procedural safeguards mandated by the due process clause.) Finally, the record contains a copy of the notice that was sent to all interested parties, which describes in detail the subject of the hearing to be held as well as the legal authority and jurisdiction for it. (ROR item XII-2)
The Court must also consider if the agency decision is supported by substantial evidence presented at the administrative hearing. The Court cannot substitute its own judgment for that of the agency. "The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted.)Cadlerock Properties v. Commissioner, 235 Conn. 661, 677, 757 A.2d 1, cert denied, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001). Judicial review of the agency's findings of law are also limited to consideration of whether or not the agency acted illegally, arbitrarily, unreasonably or in abuse of its discretion. Griffin Hospital v. Commission on Hospitals and HealthCare, 200 Conn. 489, 496 (1986) (Griffin II).
The plaintiff Wapping Community Church claims the scope of review should be expanded for its portion of the case because it claims its property rights are being taken without due process. Primarily this relates to its claims that the "new construction" finding by the DPUC (which was used to allow the individual property owners to have standing) would require expanded easements with the church for the taller poles and the different types of wire that would be run through the poles.
It appears that there may be only one pole that is actually on church property. Even though there are several poles along the church property, they may well be within the Peterson Way street property, which is the town's property. There could be as many as five poles on the church property or there might be as few as one pole. CT Page 12837
The church's claim is a very limited claim, testing the constitutionality of the action to allow the construction without appropriate legal action by CLP. The Church claims this violates its Due Process Rights.
This issue, however, does not relate to the other individual property owners, since they are on the east side of Peterson Way and not affected directly on their property by the construction.
Although this constitutional claim was not clearly raised at the DPUC hearing, it appears that the DPUC does not feel that the increase of electrical service and larger poles is a substantial enough increase to warrant new easements with the church. The DPUC approved the project without requiring CLP to secure a new easement from the church.
The DPUC made very specific orders where it felt CLP should undertake to do things in a certain way. They were not adverse to entering those types of orders, but as far as easements were concerned, they did not require CLP to get new easements.
However, even if a new easement is required and the church refuses to grant one, then CLP has the statutory authority to start a condemnation process to secure the right to place the poles on the church property. Therefore, the church is unable to prove irreparable harm.
Connecticut Light and Power Company has also stipulated they would restore the property to its present condition if the appeal is successful. This further supports the finding that the Church cannot prove irreparable harm.
As to all of the plaintiffs on the primary issues on the request for a stay, the plaintiffs cannot prevail for the following reasons:
1. None of the plaintiffs have proven irreparable harm.
 2. The homeowner plaintiffs have no claim at all because their properties are not directly affected, although they do have standing and they have certain rights under the utility statutes and the DPUC decision.
3. There is a very substantial record in this case of evidence to support the DPUC's findings and decisions. The standard of proof to uphold the agency's finding is "substantial evidence". In this CT Page 12838 case, the evidence supporting the DPUC decision is overwhelming. Tighe v. Town of Berlin, supra, at 86.
The DPUC considered several alternatives before approving the construction. (ROR, Item XI-2, p. 7.) The stay would adversely affect other electrical consumers, including commercial, household and municipal consumers, by delaying the transmission of this power from the Barber Hill substation to the Manchester substations. There appear to be two separate Manchester substations. There was evidence presented that the wires would split at Oakland Street, one going east on Oakland, one going south on Buckland.
The public interest is best served by allowing this construction to commence immediately. As far as affecting other parties in interest, CLP would be adversely affected if they had to delay the project further. They might not be able to service their customers in the future while they are delayed in completing this project.
Contrary to plaintiff's claim that CLP backed the DPUC into a corner by constructing the poles as far as it did, this simply is not correct.
The construction, according to testimony from Mr. Gault is now halted on Sullivan Avenue, north of Route 74. Therefore, they have not crossed Sullivan Avenue and run the construction up Route 74 to the corner of Peterson Way. If they had done that, it might have seemed as if it was backing the DPUC into a corner. However, they stopped construction on Sullivan Avenue. Theoretically, they could have run down Sullivan Avenue to Oakland and Buckland as of September 23, 2002. Alternatively, they could have gone east on Route 74 and then south on Peterson Way. They still had options as of September 23, 2002.
The DPUC gave great consideration to the town's position and public safety issues. Those issues all weigh in favor of running the poles and wires along the west side of Peterson Way rather than along Sullivan Avenue. The obvious ones are: Sullivan Avenue is a four-lane, very busy state road that already has a lot of traffic; construction will be more difficult on Sullivan Avenue; maintenance will be more difficult on Sullivan Avenue; the likelihood of an accident with a car or truck hitting a pole on Sullivan Avenue, just by the sheer volume and speed of traffic, would be greater than on Peterson Way; and if repairs had to be made following an accident or an electrical failure of some sort, there wold be less disruption on Peterson Way, which is a relatively quiet street serving the five homeowners, the church, the church parsonage, the town hall and the library. CT Page 12839
DPUC looked at all of those public safety issues and it appears that the DPUC gave significant thought to this decision and rendered a decision that is quite appropriate and supported by the evidence presented.
The DPUC also considered issues raised by the plaintiffs at the DPUC hearing and addressed them in its decision. This included the claim about the EMF's (electro-magnetic fields), and whether or not they are a danger. The DPUC found, in fact, that higher poles, which will be required in this project, actually create a safer environment for EMF's than lower poles.
They ordered that there would be no splicing of wires near the daycare center at the church. That was in response to a request by the Church.
CLP apparently agreed to have one pole moved, at the request of, and for the benefit of the church.
The DPUC ordered that if any installations will be required on the east side of Peterson Way, that prior notification will have to be given to the property owners and to the DPUC.
It appears that the DPUC did take into consideration issues raised by the plaintiffs at the hearing.
For all the reasons stated above, the likelihood that any of the plaintiffs would prevail in this appeal is very low. That, coupled with the fact that the plaintiffs cannot prove irreparable harm, requires that this Court dissolve the stay, effective immediately.
Therefore, the Temporary Stay ordered on August 27, 2002 is herebyDISSOLVED.
By the Court,
____________________, J. J. Kaplan, J. CT Page 12840